Annette L. O'MARA, Relator,

v.

**STATE OF MINNESOTA/UNIVERSITY OF MINNESOTA, Self-Insured, Respondent.**

No. C3-92-1276.

Supreme Court of Minnesota.

June 4, 1993.

Rehearing Denied July 15, 1993.

Patrick J. Kelly, Bannigan & Kelly, P.A., St. Paul, for relator.

Lee J. Keller, Arthur, Chapman, McDonough, Kettering & Smetak, P.A., Minneapolis, for respondent.

COYNE, Justice.

We review by certiorari a decision of the Workers' Compensation Court of Appeals reversing an award of benefits pursuant to Minn.Stat. § 176.101, subd. 3j (1992). We reverse.

Annette L. O'Mara sustained a compensable low back injury on May 26, 1987 while employed by the University of Minnesota as a laundry worker. O'Mara made an unsuccessful attempt to return to work in the employer's laundry in the fall of 1987. In August 1988 O'Mara found work she was capable of performing at Town and Country Dodge.

O'Mara attained maximum medical improvement (MMI) in April 1989 and within 90 days thereafter the University offered O'Mara a clerical job. Soon after starting the clerical job at the University, she experienced an increase in low back symptoms and on the advice of her treating physician, who considered the job inappropriate, she returned to her part-time bookkeeping job at Town and Country Dodge.

Contending that the University had not offered a job which met the criteria of Minn.Stat. § 176.101, subd. 3e(b), O'Mara sought economic recovery compensation (ERC) for a 7 percent permanent partial disability. Although it did not contest the extent of O'Mara's permanent disability, the University asserted that it had offered a suitable job and that, having rejected the employer's offer of a 3e(b) job, O'Mara was entitled to neither ERC[1] nor temporary partial disability benefits[2] but only impairment compensation.[3] The parties settled that dispute by stipulation in September 1990 and shortly thereafter O'Mara was laid off from her job at Town and Country Dodge for economic reasons. The stipulation provided that O'Mara would receive temporary partial disability benefits based on "a 22.5 hour work week at Town and Country Dodge, or other suitable employment until" the employee's actual hours worked or medical evidence warranted an increase in work hours beyond 22.5 hours per week. The stipulation also provided that the employee's claim for permanent partial disability compensation should be compromised by payment of an amount equal to impairment compensation plus 50 percent of the difference between ERC and impairment compensation. It was agreed that payment of the stipulated sum should constitute full settlement of all claims for temporary partial disability through May 26, 1990, of "all claims for permanent partial disability benefits to the extent of 7 percent of the body as a whole as impairment compensation and economic recovery compensation," and of penalties and interest. The settlement stipulation makes no reference to future temporary total disability or to compensation pursuant to section 176.101, subd. 3j.

After O'Mara was laid off at Town and Country Dodge, she found a part-time (approximately 22 hours per week) job as an office worker at Perfection Graphics, Inc., where she worked until May 13, 1991, when her employment was terminated because her employer needed an employee who could work almost full time and who could handle more physically demanding tasks. Two weeks later her treating physician judged that O'Mara was medically unable to work anywhere because of the severe deterioration of the condition of her low back as a result of the 1987 work injury. On October 22, 1991 O'Mara underwent spinal fusion surgery to ameliorate the effects of her work-related injury.

As long as O'Mara worked at Perfection Graphics the University continued to pay temporary partial disability benefits. About a month after termination of her employment there, the University served a Notice of Intention to Discontinue Benefits. Then O'Mara instituted these proceedings seeking temporary total disability benefits pursuant to Minn.Stat. § 176.101, subd. 3j (1986)[4] for the period beginning May 13,

---

1. Minn.Stat. § 176.101, subd. 3*l* (1986).

2. Minn.Stat. § 176.101, subd. 3n (1986).

3. Minn.Stat. § 176.101, subd. 3*l* (1986).

4. Minn.Stat. § 176.101, subd. 3j reads as follows:

   Subd. 3j. **Medically unable to continue work.** (a) If the employee has started the job offered under subdivision 3e and is medically

1991 when she became medically unable to continue working. On October 7, 1991 the University was allowed to discontinue payment of temporary partial disability benefits, but following a hearing on O'Mara's petition, the compensation judge found that O'Mara's job at Perfection Graphics was a "3e" job, that she became medically unable to continue in this job, and that, therefore, she was entitled to temporary total disability "3j" benefits. On appeal, the Workers' Compensation Court of Appeals reversed, concluding that because the job at Perfection Graphics, Inc., had not been procured within 90 days after O'Mara attained MMI, it did not meet the statutory criteria. Having determined that the employment from which O'Mara was medically unable to continue was not "3e" employment, the WCCA departed from its earlier rulings[5] and declared O'Mara's "disablement from that job did not result in either a new MMI period nor [sic] eligibility for temporary total benefits under the terms of subdivision 3j." *O'Mara v. State, University of Minnesota,* No. 472–72–3274, slip op. at 3 (WCCA June 18, 1992).

The proceedings before the compensation judge and the WCCA have revolved around the stipulation for settlement. Both parties' characterization of their stipulation, however, strikes us as disingenuous. The employer contends that the compensation paid the employee for permanent partial disability constituted economic recovery compensation, and that having been paid ERC, O'Mara is barred from further temporary total benefits. If the employer's payment of compensation for permanent partial disability could actu-

ally be said to constitute payment of economic recovery compensation, it was paid pursuant to a void contract because it was for a lesser amount than prescribed at Minn.Stat. § 176.101, subd. 3a (1986).[6] What was paid was a negotiated sum based and calculated on a compromise. On the other hand, the employee insists that the employer's agreement to pay temporary partial disability benefits based on her "22.5 hour work week at Town and Country Dodge, or other suitable employment" constitutes an agreement that her job at Town and Country Dodge and her subsequent employment at Perfection Graphics, Inc., were jobs which met the criteria of Minn.Stat. § 176.101, subd. 3e(b) (1986). If the employee's job at Town and Country Dodge were classified as a "3e" job, O'Mara would have been eligible for monitoring period compensation had she been laid off prior to the end of the monitoring period. More to the point, she argues that she would be eligible pursuant to Minn. Stat. § 176.101, subd. 3j for temporary total compensation in the event she became medically unable to continue her employment at Town and Country Dodge or her later job at Perfection Graphics, Inc., because of her 1987 compensable back injury. In essence, then, O'Mara's position is that the University is estopped by the settlement stipulation from asserting that O'Mara's job at Perfection Graphics was not a "3e" job or that O'Mara is not entitled to "3j" temporary total disability benefits. In the context of a stipulation for payment of temporary partial disability benefits, however, "suitable employment" cannot be said to import any meaning ex-

---

unable to continue at that job because of the injury, that employee shall receive temporary total compensation pursuant to clause (b). In addition, the employer who was the employer at the time of the injury shall provide rehabilitation consultation by a qualified rehabilitation consultant. Further rehabilitation, if deemed appropriate, is governed by section 176.102.

(b) Temporary total compensation shall be paid for up to 90 days after the employee has reached maximum medical improvement or 90 days after the end of an approved retraining plan, whichever is later. The temporary total compensation shall cease at any time

within the 90–day period that the employee begins work meeting the requirements of subdivision 3e or 3f. If no job is offered to the employee by the end of this 90–day period, the employee shall receive economic recovery compensation pursuant to this section but reduced by the impairment compensation previously received by the employee for the same disability.

5. *Schewe v. Tom Thumb Food Stores,* 46 Minn. Workers' Comp. Dec. 693, *aff'd without op.,* 485 N.W.2d 570 (Minn.1992).

6. Minn.Stat. § 176.021, subd. 4 (1986).

cept an acknowledgement that a post-injury wage based on a 22.5 hour work week was an accurate reflection of the employee's post-injury earning capacity. *E.g., Hanmer v. West Barrette Masonry*, 403 N.W.2d 839 (Minn.1987); *Johnson v. State, Dept. of Veterans Affairs*, 400 N.W.2d 729 (Minn.1987).

Prior to the 1983 revision of the Workers' Compensation Act, the term "suitable employment" arose in the context of claims for temporary partial disability benefits. If the employee did not seek or accept work within the physical limitations imposed by the work injury, benefits were denied. *Mayer v. Erickson Decorators*, 372 N.W.2d 729, 731 (Minn.1985). Even if the employee found work, the right to temporary partial disability benefits was contingent upon a post-injury wage that approximated the employee's post-injury earning capacity. *Hanmer, supra.* The term "suitable employment" for purposes of determining eligibility for temporary partial disability benefits is applied as well in cases arising under the "new law." *E.g., Arouni v. Kelleher Constr.*, 426 N.W.2d 860, 864 (Minn.1988); *see also Jasnoch v. Schwab Co.*, 495 N.W.2d 204 (Minn.1993). As used in subdivision 3e(b) of the "new law", "suitable employment" is linked to rehabilitation efforts and to the determination of the appropriate permanent partial disability benefits, *Jerde v. Adolfson & Peterson*, 484 N.W.2d 793 (Minn.1992), but that linkage does not preclude the use of the term "suitable employment" in the sense of a recognition that a given job fairly reflects a worker's post-injury earning capacity.

Generally speaking, a settlement stipulation covers only those claims or rights set out in the stipulation. *Johnson v. Tech Group, Inc.*, 491 N.W.2d 287, 288 (Minn.1992). This stipulation addresses only benefits for temporary partial disability and permanent partial disability; it does not address the possibility of future total disability nor does it mention a "3e" job or "3j" benefits. Taken as a whole and read in its entirety, it is evident that the parties' agreement that O'Mara's job at Town and Country Dodge was "suitable employment" meant only that the wages earned for that work approximated her post-injury earning capacity and that there was no intent to stipulate with respect to benefits for future temporary total disability.

Historically, Minnesota's Workers' Compensation Act has always provided support for occupationally disabled workers during periods of actual medical inability to work and for their dependents in the event of death, together with hospital, medical, and funeral expenses. If the injury left the worker with some permanent bodily impairment, compensation for that impairment has been allowed regardless whether the worker sustained a reduction in wages. *Compare* Gen.St.1913, §§ 8207(a), 8208, 8207(c) and 8212 *with* Minn.Stat. §§ 176.-101, 176.011, 176.135 (1992). *See generally,* 1C Larson, Workmen's Compensation §§ 57.10, 58.11, 58.10 (1992).

In 1983, in an effort to eliminate the open-ended nature of temporary total disability benefits and temporary partial disability benefits payable at the rate of temporary total disability benefits, the legislature revised the act so that temporary total compensation ceases 90 days after the worker attains maximum medical improvement or 90 days after the end of an approved retraining program, whichever is later. Minn.Stat. § 176.101, subds. 3e and 3f (1992). The 1983 revision also restructured the delivery of compensation for permanent physical impairment by giving employers a substantial financial incentive to provide work for an injured employee. Minn.Stat. § 176.101, subds. 3a and 3b (1992). *Parson v. Holman Erection Co.*, 428 N.W.2d 72, 76 (Minn.1988). Under the "two tier" compensation system for permanent partial disability adopted in 1983, if the employee accepts a job meeting the criteria of section 176.101, subd. 3e(b) within 90 days after attaining MMI or the end of a retraining program, the employee is entitled to impairment compensation and, if the employee's wage is less than his or her pre-injury wage, temporary partial disability benefits as well. Minn.Stat. § 176.101, subds. 3e and 3h (1992). Monitoring period compensation may be available to a worker

who is laid off from a "3e" job because of economic conditions; and temporary partial disability benefits as well as unemployment compensation may be payable to an employee who has started a "3e" job but is laid off because of the job's seasonal nature. Minn.Stat. § 176.101, subds. 3i and 3k (1992). Minn.Stat. § 176.101, subd. 3j (1992) provides that an employee who starts a "3e" job but who becomes medically unable to continue "at that job because of the injury" is entitled to temporary total compensation until 90 days after the later of MMI or the end of a retraining plan and also to rehabilitation consultation with a qualified rehabilitation consultant.

The act deals firmly, indeed rather harshly, with an employee who rejects a job offer meeting the criteria of section 176.-101, subd. 3e(b): compensation for permanent partial disability is paid as impairment compensation; temporary total compensation ceases at the time the job is refused; "no further or additional temporary total compensation is payable for that injury;" and the employee is denied entitlement to both temporary partial compensation and rehabilitation. Minn.Stat. § 176.101, subds. 3*l* and 3n (1992).

In short, the Workers' Compensation Act, as amended in 1983, makes detailed provision for temporarily disabled workers who enter upon "3e" employment after attaining MMI and for those who reject the offer of a "3e" job. It does not, however, address the plight of workers who have not received an offer of "3e" employment within 90 days after reaching MMI except to provide that those workers shall be paid economic recovery compensation for permanent partial disability and that temporary total compensation ceases when payment of economic recovery compensation begins. Minn.Stat. § 176.101, subd. 3p (1992). Of course, provision is also made for an employee who is permanently totally disabled. Minn.Stat. § 176.101, subd. *o* (1992).

■ The silence of the act with respect to the payment of temporary partial compensation to an injured employee whose employer has failed to offer a "3e" job but who is working at a job paying less than the employee's pre-injury employment has been interpreted to permit an award of temporary partial compensation. *Gasper v. Northern Star Co.*, 422 N.W.2d 727 (Minn.1988). Although temporary partial compensation at the temporary total compensation rate is not payable to an employee who is unemployed 90 days after MMI, *Parson v. Holman Erection Co., supra,* the employee becomes eligible for temporary partial compensation when the employee thereafter finds work but at a wage loss. *Morrissey v. Country Club Markets,* 430 N.W.2d 169 (Minn.1988).

■ We can ascertain no rational basis for interpreting the silence of the act with respect to compensation payable to a worker who, because of the work-related injury, becomes medically unable to continue working at a job which does not meet the "3e" criteria any differently from our interpretation of its silence with respect to temporary partial compensation payable while that employee could continue working. The Workers' Compensation Act provides that "[l]iability on the part of the employer or the insurer for disability of a temporary total, temporary partial, and permanent total nature shall be considered as a continuing product and part of the employee's inability to earn or reduction in earning capacity due to injury or occupational disease and compensation is payable accordingly, subject to section 176.101." Minn. Stat. § 176.021, subd. 3 (1986). Certainly, the worker whose pre-injury employer declines to offer a suitable job when the employee is ready to return to work is no less deserving and no less in need when the injury worsens and the worker can work no longer than an employee whose work-related injury causes a medical inability to continue in a "3e" job. In the present case there can be no serious question that the employee was actually medically unable because of her 1987 work injury to continue working at the Perfection Graphics job, for the employee underwent a two-level surgical fusion with bone graft and translamina facet screw fixation five months after leaving the employ of Perfection Graphics.

Moreover, it seems to us that relieving an employer who does *not* offer an injured employee a suitable post-injury job from any further responsibility for the employee while imposing that responsibility on an employer who *does* provide work for an injured employee would act as a powerful disincentive for offering suitable post-injury work and constitute a departure from the legislature's stated intent to provide greater compensation benefits for total disability than for partial disability.

Accordingly, we reverse the WCCA's denial of benefits. O'Mara is entitled to temporary total disability benefits from May 13, 1991 until 90 days after she attains MMI or 90 days after the end of an approved retraining plan, whichever is later; provided, however, that temporary total compensation shall cease at any earlier time that she begins work at a job within her physical capabilities. Minn.Stat. § 176.101, subd. 1 (1986).

Reversed.

Employee is awarded attorney fees in the amount of $800.

PAGE, J., took no part in the consideration or decision of this case.