Curtis **MINTER**

v.

**FORD MOTOR COMPANY.**

No. 4–91–CV–235.

United States District Court,
D. Minnesota,
Fourth Division.

July 19, 1993.

Michael Albert Pinotti, Pinotti Law Office, St. Paul, MN, for plaintiff.

Mark Ginder, George Albert Koeck, Robert L. Hobbins, Margaret M. Zverinova, Dorsey & Whitney, Minneapolis, MN, for defendant.

## ORDER

ROSENBAUM, District Judge.

Plaintiff, Curtis Minter, Jr. (Minter), filed this action in state court against defendant, Ford Motor Company (Ford), on March 11, 1991. Defendant removed the action to this Court on March 28, 1991. Count I of plaintiff's amended complaint alleges that Ford intentionally obstructed his receipt of workers' compensation benefits, in violation of Minnesota Statutes, § 176.82. Count II alleges that Ford engaged in retaliatory discrimination, in violation of Minnesota Statutes, § 363.03, subdivision 7(1), and 42 U.S.C. § 2000e–3(a) (Title VII). Count II is based upon plaintiff's having filed administrative complaints with the Minnesota Department of Human Rights (MDHR).

This case was tried to the Court on May 11, 12, 13, 17, 18, and 19, 1993.[1] The Court

---

1. At the commencement of trial, plaintiff's counsel sought to amend the complaint to include a charge of violation of the Americans with Disabilities Act. *See* 42 U.S.C. § 12101, *et seq.*

(Supp. II 1992). This oral motion was made without notice to the Court or defendant's counsel, and without a supporting memorandum of law. At the time of trial, the case was more than

adopts, as part of its findings of fact, the parties' statement of stipulated facts. Ex. 1. Those facts immediately pertinent to the determination of this matter are set forth below.

## I. *Background*

Minter is an African–American male. He commenced his employment with Ford at its Dearborn, Michigan, facility in July, 1976. In May, 1985, at plaintiff's request, Ford transferred Minter to Ford's Twin Cities Assembly Plant, located in St. Paul, Minnesota. Upon his transfer, plaintiff was assigned the "leaf spring" job. In September, 1986, Minter was reassigned to the "rear drive shaft assembly" job on the chassis line.[2]

In early November, 1986, plaintiff complained to his foreman of left shoulder stiffness, soreness, and pain. He continued to work in the assembly job, however, until March, 1987, when he was admitted to the emergency room at Divine Redeemer Hospital in St. Paul, Minnesota, for left shoulder pain. He was treated by Dr. William Drehmel and then referred to Dr. H. William Park. On April 7, 1987, Dr. Park performed surgery to repair a tear to the rotator cuff of plaintiff's left shoulder.

Plaintiff returned to work in mid-August, 1987. Upon his arrival, plaintiff presented an envelope to Darrell Lundberg, Chassis Department Superintendent. The envelope contained work restrictions prescribed by Dr. Park. These restrictions included a 35–pound weight limit and restricted pushing, pulling, and overhead work. Lundberg yelled at the plaintiff on receipt of this note, and instructed plaintiff to continue working on the assembly job.

In early November, 1987, plaintiff visited the plant's medical department complaining of soreness in his left shoulder. The medical record at Ford notes that plaintiff explained that on November 8 and 9, 1987, he had exercised with five-to-fifty-pound weights and that he thought he "overdid" it. Ex. 109. Dr. Park's medical records corroborate this description. In December, 1987, Dr. Park liberalized plaintiff's restrictions to include a 50–pound weight limit.

August, 1988, was hot in both the Twin Cities and the Ford plant. On August 17, 1988, plaintiff left the assembly line to go to Ford's medical department to seek medical care for heat difficulties. He rested for an hour and was given Gatorade. During Minter's visit to the medical department, other plant workers were obviously unhappy with the temperature inside the plant. Their discontent led to a walk-out by approximately thirty production line employees. The walk-out stopped the production line. Plaintiff's supervisor, Tim Beaudry, identified Minter as one of the walk-out leaders or instigators. Beaudry put his observations into a report. Ex. 54. As a result of this report, plaintiff was suspended, effective August 17, 1988. His employment was terminated following a disciplinary hearing conducted on August 29, 1988.[3]

On October 16, 1988, after signing an "all rules waiver," plaintiff was reinstated to the assembly job.[4] Plaintiff remained in that job for nearly a year, until August 31, 1989. At this time, for the first time, Minter approached Ford's medical staff and requested a transfer to another job. Dr. Rajput, Ford's plant physician, and Edward Miller, a

two years old, discovery had been closed since October 14, 1992, and the matter had been considered trial ready since April 26, 1993. The Court denied the motion and the case was tried on the original complaint.

**2.** "Chassis" is, of course, an automotive structure. But, at Ford, the term also indicates an in-plant department or labor unit. Other such units include "Finish," "Trim," and "Paint." Such in-plant units will be indicated, as necessary, throughout this opinion.

**3.** Plaintiff vigorously denied that he led this work stoppage. He identified the actual leader as

Lynn Hinkle, a union official. Hinkle testified and denied that he led the walkout. The Court need not resolve this discrepancy as part of the decision in this case. The Court notes, however, that Beaudry's report was filed almost immediately following the walkout.

**4.** An "all-rules waiver" permits a discharged worker to return to work on probationary status. The waiver acts as a release of all claims or grievances against Ford with respect to the discharge. This walkout, and the all-rules waiver, occurred before any workers' compensation claim or MHRA complaint.

former Qualified Rehabilitation Consultant (QRC) retained as a job placement consultant by Ford, agreed that the assembly job exceeded Minter's work restrictions.

On the same day as this initial complaint, Dr. Rajput asked Minter to select a job that he could perform. Minter requested that he be assigned to the "cardboard pick-up" job in the Trim Department.[5] Dr. Rajput placed Minter into the job on August 31, 1989. Plaintiff, however, was removed from this position after only a few hours on the job. On September 5, 1989, Minter was sent home and placed on medical leave as there were no light duty jobs available within his restrictions. Ex. 62.

The following day plaintiff was assigned the "chain unhook" job, once again on the chassis line. This position, in Dr. Rajput's opinion, was within plaintiff's work restrictions. Soon thereafter, on September 19, 1989, on Dr. Park's recommendation and at his own behest, Minter was placed on 100% medical disability leave. On October 23, 1989, Dr. Rajput registered a 12% permanent partial disability for plaintiff's left shoulder injury with the Workers' Compensation Division of the Minnesota Department of Labor and Industry.

During the evening of October 23, 1989, while plaintiff was on the 100% disability leave, David Jacobsen, a Labor Relations Representative, telephoned plaintiff two or three times. The plaintiff did not receive the calls himself—each call was taken by plaintiff's wife. Jacobsen left a message telling plaintiff to report to work the following day, as he had found a job which was within the plaintiff's work restrictions. Later that night, at about 11:00 p.m., the plaintiff, himself, called Jacobsen and "cussed him out."

The following day, John Fox, of Ford's Employee Relations Division, telephoned the plaintiff. Fox recognized that plaintiff was on 100% disability leave and apologized for Jacobsen's calls. Fox told Minter that he should not have been called in for work.

Jacobsen testified that he was unaware, when he made the calls, of plaintiff's 100% disability status.

In November, 1989, a second surgery was performed on plaintiff's left shoulder. He returned to work on or about July 19, 1990, and was placed in the "wax applicator" job in the "final prep" area.[6] That job had been examined and approved by Paul Gassler, a QRC. Plaintiff agrees that this job was within his work restrictions.

When plaintiff was first assigned to the wax application position, the job was jointly performed by two employees. One worker stood on a raised platform at each side of a vehicle, and each worker sprayed wax with a hand-held wand. In late September, 1990, this job was changed, requiring a single worker, wielding a longer wand, to apply the wax. Plaintiff contends that the job in its altered form exceeded his prescribed restrictions.

The wax application job was regularly phased out in October, 1990.[7] Ford then placed plaintiff in the "radiator secure" job, again on the chassis line. Dr. Rajput and Miller expressed the opinion that this job was within plaintiff's medical restrictions. According to Dr. Rajput, the radiator secure job also fit the November 26, 1990, Functional Capacity Evaluation (FCE) completed by an occupational therapist from the University of Minnesota. Ex. 76.

Further, in November, 1990, plaintiff filed a request seeking to change his treating physician from Dr. Edward Craig, of the University of Minnesota, to Dr. Donald Miller.[8] Ford objected to this request for transfer. Plaintiff, nonetheless, began treatment with Dr. Miller in early December, 1990. On January 29, 1991, the Workers' Compensation Division issued an administrative order approving the change. Ex. 181.

Plaintiff was assigned to the radiator secure job for fewer than 90 days. During this time, on January 2, 1991, plaintiff was disci-

---

5. The Trim Department is another in-plant work unit. See footnote 2, *supra*.

6. It is not clear to the Court that "Final Prep" is another Ford work unit.

7. All parties acknowledge that the wax application job exists only in the summer months.

8. Dr. Park had ceased treating Minter in the fall of 1989 and referred him to Dr. Craig.

plined for failure to work at a normal pace. While on the radiator secure job, plaintiff failed to report to work on at least five occasions. These absences prompted Ford to issue Minter a "five-day quit notice," and plaintiff thereafter returned to work.[9]

On January 8, 1991, Dr. Rajput, Terry Teachout, Ford's former workers' compensation administrator, and Art Held, of Ford's Labor Relations Department, met with Minter concerning a new job placement. Plaintiff requested several positions in the Paint Department.[10] Held insisted that plaintiff find a suitable job in chassis. Plaintiff continued working the radiator secure job.

Plaintiff failed to report to work on January 29, 1991. As a result, he was placed on involuntary leave of absence from January 31 to February 18, 1991. On February 19, 1991, Ford placed plaintiff on medical leave. Plaintiff receives disability benefits under the Ford/United Auto Workers "John Hancock" accident and sickness plan.[11]

In February or March, 1991, Dr. Miller suggested arthroscopic surgery on plaintiff's left shoulder. Ford contested its liability for this procedure under Minnesota workers' compensation scheme. Plaintiff obtained a second opinion which concurred in Dr. Miller's recommendation. Ford then obtained an evaluation from a doctor who stated that he "would not oppose" the surgery. Ex. 270. On June 25, 1991, a workers' compensation judge found that surgery was reasonable and necessary, and ordered Ford to pay the reasonable costs of such surgery. Ex. 183. The surgery was performed on February 18, 1992. On March 11, 1992, plaintiff executed his application for permanent disability retirement benefits. Ex. 1066.[12]

## II. Plaintiff's Workers' Compensation Claims

Plaintiff has filed three Minnesota workers' compensation claims against Ford, each arising out of his left rotator cuff injury. Ford answered each claim petition with a denial of liability and a denial that plaintiff was entitled to benefits.[13]

### A. The First Claim

The first claim petition, filed September 12, 1989, alleged a rotator cuff tear injury to his left shoulder, and claimed an injury date of November 6, 1986. This date coincides with plaintiff's emergency room visit and subsequent surgery. The petition seeks temporary total benefits, 12% permanent partial benefits, and medical benefits. Plaintiff later sought penalties against Ford, pursuant to Minnesota Statutes, § 176.225.

With respect to this first petition, a compensation judge in the Office of Administrative Hearings ("the trial court") found that plaintiff had suffered a work-related *Gillette* injury on November 3, 1986.[14] The trial court awarded plaintiff temporary total disability benefits and a 12% permanent partial disability (PPD), and assessed penalties for what that court found to be Ford's frivolous

---

**9.** A "five-day quit notice" requires an employee to respond within five days and proffer a reason for his unexcused absence or surrender his seniority.

**10.** Paint is another in-plant work unit. See footnote 2, *supra*.

**11.** "John Hancock" is a contracted-for accident and sickness benefit plan administered by John Hancock Mutual Life Insurance Company. Under this plan, covered employees unable to work for any reason receive a monthly benefit from the date of disability until the time of their death or age 65. At age 65, employees receive regular retirement benefits. The plan was negotiated by Ford and the United Auto Workers, and is funded by Ford's contributions to a plan trust fund. In Minter's case, the John Hancock monthly benefits are approximately $50 per month lower than

benefits which would be provided under the workers' compensation system.

**12.** Minter now claims that he retired only because he was "stressed." The plaintiff's own testimony showed, however, that his workers' compensation counsel knew of, and did not advise against, the retirement action.

**13.** Ford did, however, accept a March, 1989, date of injury, and paid temporary total disability benefits to plaintiff for the period September 21, 1989, through October 15, 1989. Exs. 61, 103.

**14.** In *Gillette v. Harold, Inc.*, 101 N.W.2d 200 (Minn.1960), the Minnesota Supreme Court recognized that an aggravation or re-injury to a preexisting injury could be a compensable injury under the Minnesota Workers' Compensation Act.

defense and unreasonable delay in payment. This decision was reversed on appeal.

The Workers' Compensation Court of Appeals remanded the action to the trial court on the issues of whether the plaintiff suffered a *Gillette* injury in March, 1987, whether Ford received appropriate notice of that injury, and whether plaintiff was entitled to permanent partial disability benefits. The appeals court also determined that the trial court's 12% permanency rating was premature. It reversed the finding of a November, 1986, work-related *Gillette* injury.[15] Finally, it reversed the lower court's assessment of penalties against Ford. It also found that Ford "had colorable factual and legal arguments" in support of its positions. Ex. 184.

On remand, the trial court determined that plaintiff was injured in March, 1987, that Ford received adequate notice of plaintiff's injury, and that plaintiff was entitled to temporary total disability benefits. The decision did not address the question of permanent partial disability. Ex. 185.

### B. The Second Claim

The second claim petition, filed May 12, 1991, alleged a torn rotator cuff injury and an injury date of September 6, 1990. In this petition, plaintiff requested temporary total disability and medical benefits.

### C. The Third Claim

The third claim petition, dated October 2, 1991, sought penalties for Ford's refusal to pay his medical bills.

At the time of trial, plaintiff's second and third claim petitions had not been adjudicated.

### III. *Plaintiff's MDHR Claims*

Plaintiff filed two administrative petitions with the MDHR, which are the subject of his retaliation claims.

### A. The First Claim

On January 15, 1988, plaintiff filed his first discrimination claim with the MDHR and, by referral, with the Equal Employment Opportunity Commission (EEOC). This claim alleged race and disability discrimination resulting from Ford's refusal to allow him to work within his medical restrictions. The MDHR initially found probable cause on this claim on August 1, 1989, but the charge was dismissed by memorandum dated May 14, 1991.[16] See Exs. 115, 130.

### B. The Second Claim

Plaintiff filed his second complaint with the MDHR, on March 6, 1990, alleging reprisal discrimination. In this claim plaintiff alleged 1) that on September 5, 1989, he began working the cardboard pickup job, which he felt was within his restrictions, but later was told that the job was not available; 2) that then he was placed on the chain unhook job, which he felt was outside of his restrictions and which he felt caused pain and aggravated his previous injury; and 3) that he was harassed, based upon the telephone calls placed by Jacobsen. The MDHR dismissed this charge on January 25, 1991; the EEOC dismissed the charge on May 20, 1991.

### IV. *Obstructing Benefits*

Count I of plaintiff's complaint alleges that Ford violated Minnesota Statutes, § 176.82, which prohibits the intentional obstruction of an employee's receipt of workers' compensation benefits.[17] The Minnesota Supreme Court has defined "obstruction" under the

---

**15.** The appeals court based its reversal on the fact that plaintiff's November 3, 1986, emergency room records from Divine Redeemer Hospital indicate that Minter was treated for a right shoulder injury. This injury was diagnosed as tendinitis, and the records noted that plaintiff " 'has not had something quite like this before but he has a pain quite similar to this in his left shoulder.' " Ex. 184.

**16.** The Court affords no evidentiary weight to either the determination of probable cause or the dismissal of the claim.

**17.** That provision provides:
Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages. . . .

statute as "an impediment to or frustration of the receipt of benefits." *Flaherty v. Lindsay,* 467 N.W.2d 30, 32 (Minn.1991) *(citing Kaluza v. Home Ins. Co.,* 403 N.W.2d 230, 234 (Minn.1987)). Some actual denial or disruption in the receipt of benefits must occur to warrant recovery. *Id.*

The Minnesota workers' compensation system is designed to be comprehensive. The system's assurance and ease of payment is substituted for the fault-based, litigation-intensive compensation regime which it replaced. As a result of Minnesota's enunciated change in compensation philosophy, the cases interpret § 176.82 narrowly. *See id.* at 32–33; *Bergeson v. U.S. Fidelity & Guar. Co.,* 414 N.W.2d 724 (Minn.1987). In order for plaintiff to recover, he must prove by clear and convincing evidence that the defendant "obstruct[ed] or hinder[ed], whether by deliberate action or inaction, the receipt of benefits due" and that the defendant "did so in a manner that is outrageous and extreme . . . or in a manner which is egregiously cruel or venal." *Id.* at 727. The conduct alleged must go "beyond unreasonableness, neglect, or obstinance." *Id.*

An action under § 176.82 is separate and independent from any penalty which might be awarded under the Workers' Compensation Act, Minnesota Statutes, § 176.225, for unreasonably or vexatiously delaying or denying payment of benefits. *Id.* at 726.

The Court finds that the plaintiff has wholly failed to meet his burden of proof in this case. While the plaintiff sets forth numerous bases for his obstruction claim, Ford's allegedly wrongful conduct by no means rises to the level of outrageousness, cruelty, or avarice required to prevail under the statute.

**A. Withholding Benefits**

■ Plaintiff asserts that Ford engaged in outrageous behavior in refusing to pay his 12% PPD benefits. The Court finds plaintiff's assertion insubstantial. The evidence makes clear that Ford contested the 12% PPD, asserting that at least a portion of the injury was attributable to plaintiff's non-work-related, November, 1984, fall on the ice in a hotel parking lot. While plaintiff may feel that he fully recovered from this acci-

dent, there is nothing venal or outrageous in Ford's contention that the condition was merely quiescent.

Ford's position is well-justified, based on the evidence and plaintiff's own declarations. A March 10, 1987, health history form, which plaintiff completed with the assistance of a Ford workers' compensation clerical assistant, indicated the "Nature of Disability" as "left shoulder torn rotator cuff." Ex. 99. The cause of injury is listed as plaintiff's November, 1984, fall on the ice, and the report indicates that the injury had not healed and had been bothering him ever since. *Id.* Similarly, a workers' compensation "Employee Notice of Claim," dated March 13, 1987, completed in plaintiff's own hand, lists his injury as a torn rotator cuff and the date of injury as "2 to 3 years" in the past. Ex. 1022.

Ford's position is also bolstered by a March 24, 1987, John Hancock accident report, signed by plaintiff, which lists the November, 1984, fall on the ice as "how the accident happened." Ex. 1023. Plaintiff's attending physician in March, 1987, recorded on Minter's medical records that plaintiff complained of pain in his shoulder for three or four years. There was also evidence that plaintiff was involved in a motorcycle accident during which he injured one of his arms. Ex. 1017. Finally, in mid–1991, Ford became aware that plaintiff had been involved in an automobile accident in March, 1990. Ex. 1057.

While plaintiff claims that his left shoulder injury had healed, he has presented no medical evidence to support this conclusion. The pain may well have abated; but the evidence is strong that the condition, as opposed to the acute manifestations, continued. This evidence supports the workers' compensation appellate court's determination that the work-related injury was a *Gillette* injury.

■ Plaintiff relies heavily on Ford's registration of his 12% PPD with the Workers' Compensation Division. Registration of plaintiff's 12% PPD does not, however, acknowledge liability under the workers' com-

pensation scheme.[18] Such registration merely records the claimed disability regardless of its origin. It is not an admission of fault.

In sum, Ford had ample reason to contest its liability for plaintiff's claim to workers' compensation benefits for his left shoulder injury. This substantial justification wholly obviates plaintiff's suggestion of cruelty or venality.

### B. Surgery

█ Plaintiff alleges that Ford's challenge to plaintiff's third surgical procedure on his left shoulder constitutes obstruction of his workers' compensation benefits. The claim does not withstand scrutiny.

Ford contested plaintiff's need for the third surgical procedure based on Dr. Craig's opinion that the surgery was unnecessary. Dr. Craig's letter of March 19, 1991, strongly indicates his view of the marginal utility of Dr. Miller's proposed third surgery. Ex. 124. In that letter, Dr. Craig states that "in my opinion, he did not need another operation based on my last evaluation." *Id.* As a result, Ford could—and did—legitimately question whether the prospects for recovery were below the level which would justify workers' compensation payment.

Beyond this, the Court finds that Dr. Miller's own assurances of the need for the surgery were extremely tentative. Dr. Miller's letter of April 23, 1991, noted that "the patient's chance for a successful repair of his left rotator cuff is very small. . . . I think a third attempt [at surgery] is going to be in the realm of being heroic." Ex. 123. In his May 16, 1991, letter to Ford, Dr. Miller notes:

> The chances of a successful rotator cuff repair now would be almost minimal in my opinion. The patient . . . would like to consider an arthroscopic debridement of his cuff. . . . The patient realizes that . . . surgery may not be successful in relieving his present complaints . . . [and] that it will certainly do nothing to regain his strength or change his motion pattern.

Ex. 126. Dr. Miller's letter provided ample ground to question the reasonableness of plaintiff's third surgery. The Court finds that Ford's objections to the proposed surgery were not unreasonable and cannot be used to invoke § 176.82 of the Minnesota Statutes.

Plaintiff's obstruction claim also rests on Ford's refusal to pay for a portion of the expenses related to this third surgical procedure. These bills remain unpaid to date. Ford has paid every expense related to the surgery, save and except three items: one of two anesthesiologists present at the surgery, the cost of a morphine infusion pump, and the fees of an anesthesiologist who attended the morphine pump.

The Court finds that Ford is not acting in an outrageous or extreme manner in contesting these expenses. Ford, based on its experience in making compensation payments in these types of cases, maintains that the services and charges are unnecessary and unreasonable. The testimony was uncontroverted that a single anesthesiologist is normally used for this type of surgery. Furthermore, no justification has been proffered for a morphine pump or for a doctor to attend it. The Court does not express a view on the efficacy of such charges, but Ford's contest of their payment is in no sense an outrage.

### C. Change of Physicians

█ Plaintiff also contends that Ford's objection to his change in treating physicians from Dr. Craig to Dr. Miller is actionable under the statute. The Court finds that Ford was well-justified in resisting this shift. It was clearly Ford's view that Dr. Miller was simply the product of a doctor hunt.

Minter had utilized the services of numerous physicians prior to his treatment by Dr. Craig, and each was paid by Ford without complaint. Dr. Craig had performed plaintiff's surgery and opined that all that could have been done for plaintiff's shoulder had been done. Ex. 124. Ford utilized the ap-

---

**18.** Even Dr. Park's letter to Minter's workers' compensation attorney, James C. Selmer, dated August 23, 1990, attributes 6% of plaintiff's disability to the 1987 injury and 6% to the prior personal injury from the fall on the ice. Ex. 396.

propriate workers' compensation channels in challenging the final change of physicians, and the Court finds its concerns reasonably justified. Considering Dr. Miller's original approval of Dr. Craig's ministrations, and his extremely tentative support for his own proposed surgery, the Court does not find Ford's resistance to have been designed to illegally hinder plaintiff's receipt of workers' compensation benefits.

### D. Plaintiff's Job Placements

Plaintiff claims that Ford denied him the right to work in a job within his restrictions. In support of this claim, Minter points to Lundberg's shouting at him when Minter presented his physician's letter. He then objects to being placed in the rear drive shaft assembly job despite his assertion that the job was outside his work restrictions. Minter also claims that Ford placed him in the chain unhook job and the radiator secure job knowing that these jobs exceeded his restrictions. He also asserts that the change in the wax application job to a single employee operation caused the job to exceed his restrictions.

As set forth below, the Court finds that plaintiff's allegation that Ford refused to place him in a job within his restrictions fails to state a claim upon which relief can be granted. The Court will nonetheless address these claims to the extent that plaintiff argues that Ford's actions were designed to impede his receipt of monetary benefits.

#### 1. *Placement in a Suitable Job Not a "Benefit"*

■ The Court finds that placement in a suitable job is not a "benefit" within the contemplation of the Minnesota Workers'

Compensation Act. Accordingly, Minter's claim that Ford failed to place him in a job within his medical restrictions fails as a matter of law.

A brief overview of the Minnesota workers' compensation scheme is useful here. After an employee is injured, but before he or she can return to work, temporary total compensation is available at a percentage of the employee's pre-injury wages. Minn.Stat. § 176.101, subd. 1 (1990); *Cassem v. Crenlo, Inc.*, 470 N.W.2d 102, 105 (Minn.1991). Temporary total compensation continues until 90 days after the employee reaches the level of maximum medical improvement or completes a retraining program. Temporary total compensation may cease earlier, however, if the employer offers the employee suitable work or procures such employment for the worker.[19] Minn.Stat. § 176.101, subds. 3e and 3f (1990); *Cassem*, 470 N.W.2d at 105; *Maktari v. Ford Motor Co.*, 481 N.W.2d 44, 46 (Minn. 1992). If the worker accepts a lower paying job, temporary partial benefits are awarded. *Maktari*, 481 N.W.2d at 46; Minn.Stat. § 176.101, subd. 3h.

Subdivision 3p provides that if no suitable job offer is made, the employee receives economic recovery compensation pursuant to § 176.101, subd. 3a. *Maktari*, 481 N.W.2d at 46. Economic recovery compensation is at least 120% of the impairment compensation. Minn.Stat. § 176.101, subd. 3t; *Karst v. F.C. Hayer Co.*, 447 N.W.2d 180, 184 (Minn. 1989).[20] But if the employer offers the employee a suitable job, temporary total compensation benefits cease and, if appropriate, the employee receives impairment compensation under § 176.101, subd. 3b.

---

**19.** A "suitable job" is one that is consistent with an approved rehabilitation plan or, if no plan has been approved, one that the employee can do in his or her physical condition and which produces an economic status as close as possible to that which the employee would have enjoyed without the disability. Minn.Stat. § 176.101, subd. 3e(b).

**20.** While an employer pays a premium when it fails to make a suitable job offer, there are also ramifications for the employee who refuses a suitable job offer:

The act deals firmly, indeed rather harshly, with an employee who rejects a job offer meeting the criteria of section 176.101, subd. 3e(b): compensation for permanent partial disability is paid as impairment compensation; temporary total compensation ceases at the time the job is refused; "no further or additional temporary total compensation is payable for that injury;" and the employee is denied entitlement to both temporary partial compensation and rehabilitation. Minn.Stat. § 176.101, subds. 3l and 3n.

*O'Mara v. State of Minnesota*, 501 N.W.2d 603 (Minn.1993).

The legislature, by enacting this "two tier" compensation scheme, " 'sought to provide [an] economic incentive for employers to provide suitable employment for injured employees ... and to encourage employees to accept suitable employment.' " *Maktari,* 481 N.W.2d at 46 (*quoting Parson v. Holman Erection Co.,* 428 N.W.2d 72, 76 (Minn.1988)). While the Minnesota Supreme Court has not directly addressed this point, it is clear to the Court that when the legislature sought to provide financial incentive to employers to place injured workers in suitable jobs, it imposed no obligation to make such a job offer. The penalty for an employer failing to make a suitable job offer is its enhanced workers' compensation burden.[21]

While not directly on point, *Karst v. F.C. Hayer Co., Inc.,* 447 N.W.2d 180 (Minn.1989), is instructive. In *Karst,* the Minnesota Supreme Court held that the exclusive remedy provision of the Minnesota workers' compensation statute precluded an action for disability discrimination under the MHRA, where an employer refused to rehire an employee following a work-related injury. Similar to Minter's complaint that Ford refused to place him in a job within his restrictions, the plaintiff in *Karst* complained that his employer refused to rehire him as long as his work restrictions remained in effect. *Id.* at 182–184.

The Minnesota Supreme Court concluded that the Minnesota Workers' Compensation Act did provide a remedy for disability discrimination—the difference between the impairment and economic recovery benefits under § 176.101, subd. 3, or what the court dubbed the "job offer/no job offer" differential. *Id.* at 184. The Court went on to state that "[i]t is important to note that [the plaintiff] has not been without a remedy. He has already collected nearly a quarter of a million dollars and is seeking additional compensation.... [A]n employer must have some discretion in deciding whether to rehire an injured employee." *Id.* at 186.

The provisions of § 176.101, as well as the implications from the related case law, convince this Court that while the legislature sought to provide an economic incentive for employers to place injured employees in jobs within their restrictions, the workers' compensation scheme does not mandate such placement.[22] Accordingly, the Court finds that plaintiff's obstruction claim, insofar as he alleges that Ford refused to place him in a job within his restrictions, fails as a matter of law.

This determination notwithstanding, the Court considers the specifics of plaintiff's claims against Ford.

### 2. *Lundberg's Yelling*

The evidence showed that nothing can be derived from Lundberg's yelling at the plain-

---

21. *Compare* Minn.Stat. § 176.101, subd. 3, with Wis.Stat. § 102.35(3) (1983). The Wisconsin statute provides that "any employer who without reasonable cause refuses to rehire an employee who is injured in the course of employment, where suitable employment is available within the employee's physical and mental limitations ... has exclusive liability to pay the employee the wages lost during the period of such refusal, not exceeding one year's wages." The Wisconsin appellate court, based on this provision, has similarly decided that the Wisconsin workers' compensation statute provides the exclusive remedy for wrongful refusal to rehire. *Schachtner v. Dept. of Industry, Labor, and Human Relations,* 144 Wis.2d 1, 422 N.W.2d 906 (Ct.App.1988).

22. The cases cited by plaintiff support the proposition that an offer of suitable employment is linked to the determination of benefits. They do not stand for the proposition that a suitable job is a "benefit" to which an injured employee is entitled. *See Hammerlund v. Itasca Medical Cen-*

*ter,* 1991 WL 169638 (Minn.Work.Comp.Ct.App. 1991) (affirmed trial court's denial of employer's petition to discontinue benefits based on finding that the job offered was unsuitable under § 176.-101, subd. 3e); *Kuhlman v. Gresser, Inc.,* 44 W.C.D. 139 (Minn.Work.Comp.Ct.App.1990) (affirmed award of temporary benefits based on finding that employee was not offered a suitable job); *DeGroat v. Eckrich, Inc.,* 44 W.C.D. 110 (Minn.Work.Comp.Ct.App.1990) (same); *Heiderscheit v. Sanborn Mfg. Co.,* 42 W.C.D. 841 (Minn. Work.Comp.Ct.App.1989) (employer justified in denying economic recovery compensation to an injured employee who refused to accept an offer of a suitable job); *Collier v. Septran, Inc.,* 42 W.C.D. 32, 1989 WL 226537 (Minn.Work.Comp. Ct.App.1989) (employee who refused a subdivision 3e job offer is not entitled to temporary compensation); *Dengerud v. Utley–James,* 41 W.C.D. 182, 1988 WL 216914 (Minn.Work. Comp.Ct.App.1988) (employee entitled to economic recovery compensation as he did not obtain a suitable job).

tiff. Every witness who spoke on the subject testified that Lundberg is testy and volcanic by nature. Lundberg's reaction was no surprise. The plaintiff anticipated this reaction to the extent that Minter alerted fellow employees, in advance, that they should watch Lundberg's explosion when he saw the doctor's note.[23]

The evidence also showed that the proper step for a Ford employee returning to work with medical restrictions was to present his or her restrictions to the Medical Department. This department has primary responsibility for the placement of medically restricted workers. Lundberg was a foreman and was not in the medical department. The evidence also demonstrated that on August 31, 1989, the very day Minter reported to Dr. Rajput that he experienced pain in performing the assembly job, she immediately arranged for his reassignment.

### 3. *Transfer from Cardboard Pick-up*

Much is made of plaintiff's transfer out of the cardboard pick-up job. The Court affords it little significance. The record makes clear that ordinary and customary plant policies require that every attempt be made to place a medically restricted worker, and particularly a permanently disabled worker, in his "home" department before looking outside that area for job placement. Moreover, it is uncontroverted that the cardboard pick-up job is one which is usually performed by a temporarily disabled worker. It is not a long-term placement for a worker, such as Minter, who suffers a permanent disability.

Before consulting Don Anderson in the Labor Relations Department, Dr. Rajput placed plaintiff in the Trim Department. When Anderson got word of that assignment, he determined that all efforts had not been made to place plaintiff in chassis—Minter's "home" department. Plaintiff was, therefore, reassigned to the chain unhook job on the chassis line, consistent with company policy.

### 4. *Chain Unhook Job*[24]

Plaintiff offered no expert evidence whatsoever that the work was outside of Minter's work restrictions. Dr. Rajput viewed the chain unhook job, before placing Minter in that position, and determined that it complied with the restrictions established by Dr. Park. To the Court's observation, and this aspect of the job has not changed, an employee may choose the height at which to perform the raised portion of this work. Since the eye through which the hook is inserted is descending, the chain unhook worker need only wait until the work "falls" below chest level. Furthermore, plaintiff's complaints of difficulty in wheel alignment are overstated. The wheels can be adjusted either by using his thighs to push the wheels into the proper position, or by using his arms. Either option is available to the line worker.

### 5. *Wax Application Job*

The evidence revealed no indication of animus in the change of the wax application job from a two-person to a one-person operation. The job was still light duty, whether conducted by one or two workers. Furthermore, plaintiff testified that he objected to driving vehicles to the wax application area. This was certainly within his restrictions; he just preferred not to drive. The alteration of the wax application job does not support a retaliation claim.

### 6. *Radiator Secure Job*

Plaintiff maintains that Ford placed him in the radiator secure job knowing it was outside his restrictions. Dr. Rajput testified that she placed plaintiff in the radiator secure job based on her belief that it was within his medical restrictions.

The Court finds that plaintiff made little or no effort to perform the radiator secure job. Plaintiff almost immediately complained that the job "moved too fast" and that he "would not run for Ford." At the time of the complaints, plaintiff made no reference to any physical difficulties. Minter's superintendent

---

**23.** The Court makes explicit its finding that there was no racial aspect to Lundberg's outbursts. Each witness who testified on the subject said that Lundberg yelled at whites as well as blacks.

**24.** The Court, with consent of the parties, visited the work site and observed the chain unhook, wax application, and radiator secure jobs in some detail. Since Minter's term of employment, each job has been somewhat modified due to adjustments after model changes.

and immediate supervisor both observed that plaintiff never attempted to fully perform the job. While the average employee learns the job in less than two days, plaintiff never performed the job in its entirety, even after several days on the job. He frequently requested to go home or to go to the Medical Department. Plaintiff testified that, rather than work, he wanted to get out on permanent medical leave in January, 1991.

Accordingly, the Court finds that plaintiff's placement in the radiator secure job fails to support a claim of obstruction.

### E. Walkout Termination

■ Plaintiff claims that Ford's termination of his employment for leading the walk-out in August, 1988, was designed to obstruct his receipt of workers' compensation benefits. As an initial matter, plaintiff did not file any of the disputed workers' compensation claims until over a year after this discharge. As such, this incident is factually, and legally, unrelated to his complaint of obstruction.

No evidence indicated that the action was taken for any reason other than Ford's belief that plaintiff was a leader in the work stoppage. Virtually all employees involved in the walk-out, depending on their involvement, were punished by Ford. Two other employees, a white male and a white female, were dismissed on the same type of evidence, and each was reinstated, on the same day as Minter, after executing an all-rules waiver.

### F. Jacobsen's Calls

Plaintiff claims that Jacobsen's October, 1989, phone calls constituted obstruction. This complaint is silly. The Court finds nothing outrageous or unreasonable in three telephone calls offering an injured employee a job within his work restrictions. There is no evidence at all that Jacobsen's words were other than conversational in tone or that he used any profanity. Plaintiff did not even take the calls. The next day an employee relation officer called and apologized. This ended "the incident."

After considering the evidence at trial, the Court finds that Ford engaged in no outrageous conduct designed to hinder plaintiff's receipt of workers' compensation benefits.

### V. Retaliatory Discrimination Claim

Plaintiff alleges that defendant took adverse employment actions against him on the basis of his having filed discrimination claims with the MDHR, in violation of 42 U.S.C. § 2000e–3(a) and Minnesota Statutes, § 363.-03, subdivision 7(1).[25]

■ To establish a prima facie case of unlawful retaliation, plaintiff must establish by a preponderance of the evidence that:

1) he complained of discrimination;

2) the defendant took adverse action against him; and

3) the adverse action was causally linked to the complaint of discrimination.

*Marzec v. Marsh,* 990 F.2d 393, 396 (8th Cir.1993) (*citing Martin v. Local 1513 et al.,* 859 F.2d 581, 585 (8th Cir.1988)). The permissible scope of plaintiff's retaliatory discrimination claim is limited to "any discrimination like or related to the substance of allegations in the [MDHR] charge and which reasonably can be expected to grow out of the investigation triggered by the charge." *EEOC v. Delight Wholesale,* 973 F.2d 664, 668 (8th Cir.1993) (citations omitted).

■ In many respects, the incidents offered to prove plaintiff's retaliatory discrimination claims parallel those offered to prove

---

**25.** Title 42, United States Code, § 2000e–3(a) (1981) provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because he has ... made a charge ... under this subchapter.

Minnesota Statutes, § 363.03, subdivision 7(1) (1991) provides:

It is an unfair discriminatory practice for any employer ... to intentionally engage in any reprisal against any person because that person ... has filed a charge under this chapter....

A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment. It is a reprisal for an employer to do any of the following ... refuse to hire the individual, depart from any customary employment practice; [or] transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security; or other employment status....

his claims under the workers' compensation statute. First, he cites incidents relating to his job placements, including 1) Lundberg's outburst and refusal to respect his work restrictions; 2) Minter's removal from the cardboard pick-up job and subsequent placement in the chain unhook position; 3) his placement in the radiator secure job with knowledge that it was outside his restrictions; and 4) Ford's alteration of the wax application job. Then plaintiff claims that his termination following the walk-out was in retaliation for his filing of administrative charges. Third, plaintiff alleges that Jacobsen's phone calls constituted retaliation discrimination. Fourth, plaintiff alleges that Ford's withholding of workers' compensation benefits without competent medical proof constituted retaliation for filing MDHR claims. .

The Court finds that the evidence fails to support a causal link between plaintiff's filing of charges with the MDHR and any alleged retaliatory employment actions.

### A. Job Placement

The evidence failed to establish any nexus between plaintiff's filing of MDHR charges and plaintiff's job assignments. First, Lundberg's outburst occurred *prior* to plaintiff's first MDHR complaint. As such, it could not have been retaliatory. As to plaintiff's remaining retaliation claims, the Court finds, as set forth above, that Ford's job placement decisions conformed to plant policy which consistently favored placing a permanently disabled worker in a job believed to be within that worker's restrictions.

The evidence was uncontradicted that Ford policy dictates that only the plant manager, the employee relations manager, the labor relations supervisor, and the labor relations representative are advised of a discrimination charge. The evidence showed that when Ford receives a discrimination charge it is assigned to a labor relations representative who conducts an inquiry to prepare Ford's response. If an MHRA or EEOC administrative determination of probable cause is made, that decision is distributed in the labor relations department to the representative assigned to the case, and to other representatives on a "need-to-know" basis. There was no evidence showing a departure from this policy in Minter's case.

John Fox, the assigned labor relations representative in Minter's case, testified that no one on the production floor learned of the first complaint. He testified that his investigation went no further than Dr. Rajput. As to the second charge, Dr. Rajput, who was primarily responsible for placing plaintiff into positions in accord with work restrictions, had no knowledge of plaintiff's MDHR charge. Edward Miller, the ex-QRC, testified that he had no knowledge of any charges when he was involved in plaintiff's placement. There was no evidence to the contrary. The Court credits Miller's testimony.

There is not a scintilla of evidence that plaintiff's transfer from the Trim Department to the Chassis Department was made as a consequence of plaintiff's filing of an MDHR claim. Don Anderson, who initiated the transfer out of the Trim Department, testified, without contradiction, that he knew nothing of plaintiff's administrative charge at the time the incident took place. He did not discover the existence of the first MDHR charge until he examined Minter's file when Ford received notice of the second, March, 1990, charge. The evidence is clear that Minter was removed from the cardboard pick-up job in order to comply with the company policy favoring placement of permanently disabled workers in their home department.[26]

Finally, there was not a trace of evidence that the alteration of the wax application job was in any way connected to Minter's administrative charges.

### B. Walk–Out Termination

The evidence does not support plaintiff's claim that termination for participation in the

---

**26.** Plaintiff, as evidence of retaliation, points to the fact that a white male employee was placed in the cardboard pick-up job after he was removed. That employee, who was temporarily disabled, held the position for only two weeks. Thereafter, this worker was placed on a medical leave of absence due to a lack of available work. The Court does not find this to be evidence of retaliation.

walk-out constituted retaliatory discrimination. There is no indication that his termination was in any way linked to any discrimination charge. See discussion at ¶ IV.E., *supra*.

### C. Jacobsen's Phone Calls

The Court finds no evidence of retaliation with respect to this incident. As set forth above at ¶ IV.F., Jacobsen was apparently unaware of plaintiff's disability status, and phoned to tell him that he had found a suitable placement for him. There is no evidence which links these inconsequential telephone calls to plaintiff's filing of a discrimination charge.

### D. Withholding Benefits

The evidence does not support plaintiff's claim that Ford's dispute concerning his left shoulder compensation claim was associated with his discrimination claims. Susan Herboldt, Ford's workers' compensation administrator from 1987 through 1990, who was responsible for determining primary liability, testified that she had no knowledge of plaintiff's administrative charges. Terry Teachout, Ford's workers' compensation representative, did not know of the claims until plaintiff, himself, told him in November, 1990. As set forth in detail above, the Court finds that Ford's contest of these claims was substantially justified.

### E. Surgery

Plaintiff's claim that Ford contested his third surgery in retaliation for his filing of MDHR claims is without merit. Plaintiff presented no evidence of a causal link between his filings and Ford's opposition to the surgery. As indicated above, Herboldt offered credible testimony that she was unaware that plaintiff had filed discrimination charges and, as the Court determined, *supra,* Ford had reasonable grounds to contest liability for the costs of the surgery.

### VI. *Conclusion*

The Court finds in favor of the defendant as to Counts I and II of plaintiff's complaint. Plaintiff shall take nothing by this action, and judgment shall be entered in favor of the defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.