Arturo ALCOZER, Relator,

v.

NORTH COUNTRY FOOD BANK, and
American States Insurance Co.,
Respondents,

Polk County, Self–Insured/Minn.
Counties Ins. Trust,
Respondent,

and

MN Department of Human
Services, Intervenor.

No. CX–01–19.

Supreme Court of Minnesota.

Nov. 29, 2001.

John A. Winters, Crookston, appellant attorney.

Mark J. Freeman, Minneapolis, (North Country Food Banks) respondent attorney.

Timothy P. Eclov, Minneapolis, (Polk County), respondent attorney.

Suzette C. Schommer, Assistant Attorney General, St. Paul, Intervenor attorney.

## OPINION

STRINGER, Justice.

Relator Arturo Alcozer appeals from the dismissal of his claim for workers' compensation. At the time of his alleged injury, Alcozer and his family were receiving as-

sistance through the Aid to Families with Dependent Children (AFDC) program. In order to avoid a sanction under AFDC, Alcozer participated in the Polk County Community Work Experience Program (CWEP), which was administered for the county by the Minnesota Department of Economic Security. Alcozer alleged that he was injured while unloading a truck at North Country Food Bank (North Country) in Crookston, Minnesota, a nonprofit organization that had agreed to host Polk County CWEP participants at its facility. Alcozer asserted a workers' compensation claim against North Country and Polk County. His claim was dismissed by the Minnesota Department of Labor and Industry based on its conclusion that Alcozer was not entitled to seek workers' compensation benefits because he was not an "employee" as defined by Minn.Stat. § 176.011, subd. 9 (2000), and because Minn.Stat. § 256.737, subd. 7 (1996), the Injury Protection Program (IPP), provided the sole remedy for injuries arising out of any community work experience program. On Alcozer's appeal, the ruling of the compensation judge dismissing his claim on the basis that he was not an employee of either North Country or Polk County was affirmed by the Minnesota Workers' Compensation Court of Appeals (WCCA).

We affirm.

At the time of the workers' compensation hearing, Alcozer was divorced with children and had been living in Minnesota since 1985 when he and his family moved from Texas. He worked as a farm laborer, but then turned to public assistance for help. In December 1996, Alcozer and his family were receiving AFDC payments of $1,000 per month.[1] Polk County Human Services [2] informed Alcozer that in order to avoid sanctions that would reduce his family's AFDC payments, he would need to participate in work activities.

Polk County contracted with the local Minnesota Department of Economic Security Work Force Center (Work Force Center) to provide job training and placement and administer the state and federal work activity requirements for non-exempt AFDC recipients residing in the county. When first referred to the Work Force Center, AFDC recipients like Alcozer were given an orientation and required to conduct a four-week job search. Alcozer did not secure employment during the first four weeks of his search and was therefore enrolled in CWEP, a program administered by the Work Force Center on behalf of Polk County.

The Polk County CWEP program was operating under Minn.Stat. § 256.737 (1996) which established community work experience programs, authorized by federal legislation,[3] to provide AFDC recipients who were unable to secure paid employment the opportunity to gain job skills and comply with work activity requirements by participating in activities at governmental

---

1. The AFDC program was repealed by Congress on August 22, 1996 in favor of more latitude for states to design their own programs for the support of families with children. Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, 110 Stat. 2105 (1996). The AFDC program was replaced throughout Minnesota with the Minnesota Family Investment Program (MFIP) in 1997. Act of April 29, 1997, ch. 85, 1997 Minn. Laws 499 (now codified at Minn.Stat. ch. 256J (2000)).

2. Polk County Human Services administered the AFDC eligibility determination for applicants residing in the county.

3. *See* 42 U.S.C. § 682(f) (1995) (authorizing the formation of locally administered community work experience programs and setting forth the manner in which they should be operated).

or nonprofit social service sites.[4] Federal regulations allowed states to "provide worker's compensation or other comparable protection for CWEP participants," 45 C.F.R. § 238.18 (1994), thus permitting the establishment of a program in lieu of workers' compensation for CWEP participants. Accordingly, the purpose of Minnesota's IPP program was to provide "[p]ayment of any claims resulting from an alleged injury or death of a recipient participating in a community work experience program established and operated by a county * * *." Minn.Stat. § 256.737, subd. 7.[5] The statute authorizing the IPP program further provided:

> The procedure established by this section is exclusive of all other legal, equitable, and statutory remedies against the state, its political subdivisions, or employees of the state or its political subdivisions. The claimant shall not be entitled to seek damages from any state, county, tribal, or reservation insurance policy or self-insurance program.

*Id.*, subd. 7(f). The IPP specifically excluded coverage for "pain and suffering, lost wages, or other benefits provided in chapter 176." *Id.*, subd. 7(e).

When CWEP was developed, the Work Force Center approached North Country and other nonprofit organizations in the community about becoming CWEP sites and helping individuals gain work history. North Country and the Work Force Center signed a "Contractual Agreement" providing that North Country would provide supervision, a safe working environment, and sufficient job duties for CWEP participants at the site. Ron Graham, executive director of North Country, testified before the workers' compensation judge that he asked whether North Country would be liable if a participant was injured onsite and was told that CWEP was responsible for compensation. He further testified that North Country did not carry Workers' Compensation insurance on CWEP participants nor would North Country participate in the program if required to carry insurance for CWEP participants, stating that CWEP participants provide "marginal help to us in the first place, and it's just not something that would make sense to us." The only reference to responsibility for liability in the agreement signed by North Country and CWEP was North Country's promise to report any injuries to the Department of Economic Security within seven days.

4. Minnesota Statutes § 256.737 (1996) provided, in relevant part:

> Subdivision 1. Establishment and purpose. To the degree required by federal law or regulation, each county agency must establish and operate a community work experience program to assist nonexempt caretakers in AFDC–UP households achieve self-sufficiency by enhancing their employability through participation in meaningful work experience and training, the development of job search skills and the development of marketable job skills.
> Subd. 2. Program requirements. (a) Worksites developed under this section are limited to projects that serve a useful public service * * *. To the extent possible, the prior training, skills, and experience of a

recipient must be used in making appropriate work experience assignments.
Following the repeal of AFDC and CWEP at the federal level, *see* footnote 1 *supra*, CWEP has been retained as part of the MFIP program, and the current law authorizing the operation of county CWEP programs is quite similar to what was in place at the time of Alcozer's injury. *See* Minn.Stat. § 256J.67 (2000).

5. At the time of Alcozer's injury, the IPP was codified at Minn.Stat. § 256.737, subd. 7 (1996). Following the elimination of the AFDC program, the IPP was included in the MFIP program and is now codified at Minn. Stat. § 256J.68 (2000). The provisions relevant to this appeal are essentially unchanged by the recodification.

Before participating in work activities through CWEP, Alcozer signed a "CWEP Participant Agreement" in which he agreed to participate in CWEP to avoid sanctions that would reduce his family's AFDC benefits. Alcozer also signed an IPP medical release form that authorized the exchange of information necessary to process claims under the IPP and provided information about how to file an IPP claim. Alcozer also completed a blank "Application for Employment: CWEP Position" to be provided to the CWEP placement sites where Alcozer decided he might like to work. Alcozer began working at North Country on December 11, 1996. To maintain his full AFDC benefits, Alcozer was required to work 16 hours a week, but the federal authorizing legislation provided that he was not entitled to be paid for his participation.[6] Each day when he arrived at the food bank, he would report to the foreman who would document his hours and tell him what to do. Alcozer explained that his work involved unloading trucks, making up food packages, and sweeping. Graham acknowledged that Alcozer provided a benefit to North Country.

Alcozer testified that he was injured while working at the warehouse facility of respondent North Country in Crookston, Minnesota on February 10, 1997. Alcozer stated, "I was lifting a pallet, and it pushed me up against the wall, and then it twisted, and that's when my arm hit up against the wall." The initial medical assessment indicated that Alcozer suffered neuropathy from a contusion of the elbow around the

ulnar nerve. He received physical therapy, ultrasound, and chiropractic treatments through the spring and summer of 1997. Alcozer continued to experience pain and numbness in his left elbow and three of the fingers on his left hand, and an orthopedic evaluation revealed that he had cubital tunnel syndrome and mild carpal tunnel syndrome. After a submuscular ulnar nerve transposition was performed in December 1997, he no longer suffered from pain in his elbow, but he still experiences numbness in his fingers. His medical bills totaling $3,002.75 were initially paid by the Medical Assistance program.

Under the IPP, any claim for more than $1,000 must be presented to the legislature and payment will be made only if authorized in a bill that passes both houses and is signed by the governor. Minn.Stat. § 256.737, subd. 7(d) (1996).[7] Alcozer's medical bills were brought to the attention of Randy Rennich at the Minnesota Department of Human Services (DHS) who is responsible for assisting counties with investigations of CWEP injury claims, authorizing payments for bills under $1,000, and submitting larger claims to the legislature's Joint Senate–House Subcommittee on Claims. Rennich testified that to his knowledge there is no judicial review of the legislature's action, but that all claims presented had been approved and paid.

Rennich arranged for an evaluation of Alcozer's claim and was subsequently advised that the claims be paid. Rennich

---

**6.** *See* 42 U.S.C. § 682(f)(1)(C) (1995).

**7.** Minnesota Statutes § 256.737, subd. 7(d) (1996) provides, in relevant part:
On or before February 1 of each year, [DHS] shall submit to the appropriate committees of the senate and the house of representatives a list of claims in excess of $1,000 * * * together with any recommendations of appropriate compensation.

These claims shall be heard and determined by the appropriate committees of the senate and house of representatives and, if approved, shall be paid under the legislative claims procedure.
Alcozer's claim was submitted to the Joint Senate–House Committee Subcommittee, made up of 3 members of the senate and 3 members of the house of representatives.

recommended to the Joint Senate–House Claims Subcommittee that the legislature approve Alcozer's claim for medical bills. He also advised the subcommittee that Alcozer may be applying for partial permanent disability benefits under the IPP in the future. The bill authorizing payment was passed[8] and the Medical Assistance program was reimbursed for Alcozer's medical expenses. Alcozer has not initiated any claims with the IPP, nor has he personally received any payments from the IPP.

On March 1, 1999, Alcozer filed a workers' compensation claim listing North Country as his employer and seeking temporary total disability benefits from the date of the injury. On March 31, 1999, the DHS filed a motion to intervene in the proceedings on the grounds that it was entitled to reimbursement for medical and subsistence payments made on behalf of Alcozer from the Medical Assistance program and AFDC. No action was taken on the motion. On September 27, a compensation judge issued a summary decision dismissing Alcozer's claim petition on the basis that Alcozer was not an employee of North Country, Polk County, or the State of Minnesota. Alcozer objected to the decision by requesting a formal hearing. Following the hearing, the compensation judge again dismissed Alcozer's claim. The judge found by a preponderance of the evidence that Alcozer was not an employee or a voluntary uncompensated worker under the Workers' Compensation Act. The judge did not address Alcozer's arguments that the IPP is unconstitutional.

Alcozer appealed to the WCCA, which affirmed the findings and order of the compensation judge. The WCCA conclud-

ed that Alcozer was not working under a contract for hire on the basis that Alcozer's benefits would not increase if he worked more than 16 hours a week. The WCCA stated that it would not reverse the compensation judge absent "a more definitive contract for receipt of wages or other benefits more proportionate to his work." The court also concluded that Alcozer was not a voluntary uncompensated worker because there was no evidence that he would have volunteered for North Country if he had not been under an obligation to do so in order to receive his AFDC benefits. The court did not address the impact of the exclusive remedy provisions of the IPP nor did it evaluate Alcozer's constitutional arguments.

On appeal to this court, Alcozer argues that he should be able to maintain an action for workers' compensation benefits because the IPP is not the exclusive remedy for injured CWEP participants and because he was an employee of North Country under the definition of "employee" provided in the Minnesota Workers' Compensation Act, Minn.Stat. § 176.011, subd. 9.[9] Alcozer maintains that the IPP's exclusive remedy provision at Minn.Stat. § 256.737, subd. 7(f) does not apply to North Country because it is not the state, a political subdivision of the state, or an employee of the state or its political subdivisions. Alcozer argues that he performed valuable services for North Country in exchange for a portion of his AFDC benefits and that this court has held that an employment relationship can be present regardless of whether wages are paid to the worker. *Cristello v. Township of Irondale,* 195 Minn. 264, 265, 262 N.W. 632, 633 (1935) (finding employment relation-

**8.** See Act of May 17, 1999, ch. 169, § 4, 1999 Minn. Laws 925.

**9.** According to Minnesota Statutes § 176.011, subd. 9, " 'Employee' means any person who performs services for another for hire * * *."

ship remained intact even during period in which employee was providing employer services in exchange for repayment of debt). Alcozer further asserts that because payment of his AFDC benefits was dependent upon his work, he was receiving valuable consideration for his work. *See* 3 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 64.04 (2000) (stating that "a laborer whose receipt of payment is dependent on and in proportion to his or her labor should be considered an employee"). Alcozer cites to cases from other jurisdictions holding that public welfare recipients engaging in work activities as part of the receipt of benefits are employees and, specifically, that they are employees of those agencies and organizations that control their daily work assignments. *See Dagen v. Village of Baldwin,* 183 Mich.App. 484, 455 N.W.2d 318 (1990); *Chichester School Dist. v. W.C.A.B.,* 140 Pa.Cmwlth. 224, 592 A.2d 774 (1991). In the alternative, Alcozer argues that he is entitled to workers' compensation benefits because the Workers' Compensation Act applies to "a voluntary uncompensated worker participating in a program established by a local social services agency." Minn.Stat. § 176.011, subd. 9(10) (2000). In support of this argument, Alcozer points out that he voluntarily participated in the CWEP program organized by the local social service agency and that he was uncompensated.

Alcozer further asserts that if the IPP does provide the exclusive remedy, it is unconstitutional because it does not constitute an adequate alternative to common law remedies for injuries to employees in violation of Minn. Const. art. 1, § 8, which provides that every person is entitled to a remedy for personal injuries. He also claims that if it is the exclusive remedy, the IPP would violate the due process clauses of the state and federal constitutions. U.S. Const. amend. XIV, § 1;

Minn. Const. art. 1, § 7. Alcozer compares the benefits available under the Workers' Compensation Act and the IPP and concludes that the IPP does not provide comparable benefits because it does not sufficiently cover loss of future earning capacity. He cites a decision of the Kansas Supreme Court holding that coverage for injured CWEP participants was inadequate because it fell below the protection afforded by the state workers' compensation act, violating Kansas law. *See Gamblian v. City of Parsons,* 261 Kan. 541, 931 P.2d 1238, 1246 (1997). Alcozer further argues that the IPP provides insufficient procedural due process because he did not receive formal notification of a hearing and there is no judicial review or appeal process.

North Country, Polk County and DHS (hereinafter collectively referred to as respondents) deny that Alcozer was an employee or voluntary uncompensated worker, and argue that the IPP's exclusive remedy provision precludes any recovery under the Workers' Compensation Act and that the IPP is constitutional.

## I.

On review, we will not disturb the factual findings of a compensation judge unless they are manifestly contrary to the evidence presented. *Hengemuhle v. Long Prairie Jaycees,* 358 N.W.2d 54, 60 (Minn.1984). We review questions of law de novo. *Kliniski v. Southdale Manor, Inc.,* 518 N.W.2d 7, 9 (Minn.1994).

Alcozer argues that by agreeing to be a host organization for CWEP participants seeking work experience, North Country became an employer of participants such as Alcozer and is subject to suit under the workers' compensation statutes, despite the exclusive remedy provision of

the IPP.[10] It is undisputed that under the exclusive remedy provision of the IPP, the state and its political subdivisions are not subject to suit by a CWEP participant, but Alcozer argues that the exclusive remedy provision is to be read narrowly to allow suit against non-governmental entities participating in CWEP.

We disagree. Alcozer was participating in a program administered and operated by Polk County, an entity that is unquestionably a political subdivision. The provision in Minn.Stat. § 256.737, subd. 7 that IPP is to pay "any" claims clearly indicates that Minnesota opted, as allowed by federal regulations, to provide the IPP in place of statutory workers' compensation for CWEP participants. The interpretation urged on us by Alcozer would lead to the bizarre result that IPP is the exclusive remedy for CWEP participants at governmental sites and CWEP participants at non-governmental sites could access both IPP and workers' compensation benefits. We do not believe the legislature intended to make such an arbitrary distinction.

Further, narrowly interpreting the exclusive remedy provision of the IPP as urged by Alcozer would distort the nature of North Country's role in the program and ignore the federal regulatory scheme in which the IPP was enacted. A central goal of welfare reform and the Minnesota Family Investment Program (MFIP) has been to promote self-sufficiency. The CWEP program is designed to engage participants in meaningful work activities that will enhance the participant's employability. Minn.Stat. § 256.737, subd. 1 (1996). If the IPP is disregarded and CWEP participants are permitted to bring workers' compensation actions against non-governmental placement sites, a substantial negative impact on the availability of worksites willing to host CWEP participants who need work experience is predictable. Surely the legislature enacted the IPP to further the goals of the CWEP program, not to hinder counties' efforts to secure program sites for participants.

## II.

■ Next, we consider Alcozer's argument that he is an employee of North Country for purposes of workers' compensation. The Minnesota Workers' Compensation Act defines an employee as "any person who performs services for another for hire * * *." Minn.Stat. § 176.011, subd. 9. The definition also includes "a voluntary uncompensated worker participating in a program established by a local social services agency." Id., subd. 9(10).

North Country provided a service to Polk County and Alcozer by allowing the county-administered CWEP program to place Alcozer at its facility to gain work skills and experience. Alcozer was given the opportunity to engage in work activities at North Country through the CWEP program to permit him to comply with the work requirements of his family's welfare grant. He did not seek employment at North Country, nor did North Country attempt to hire him, and he was never paid by North Country.

The dissent relies on prior case law that is clearly distinguishable. To the extent that the dissent relies on *Miller v. Federated Mutual Ins. Co.*, the central issue there was the interpretation of automobile insurance exclusion language,[11] not the

---

10. *See* Minn.Stat. § 256.737, subd. 7(f).

11. The workers' compensation carrier for the federal jobs program in *Miller* brought an action for subrogation against Miller, the driver of a vehicle owned by a third party. The automobile insurer of that vehicle declined to defend Miller in the subrogation action and this court held that the automobile insurance co-employee exclusion statute

statute in question here. 264 N.W.2d 631 (Minn.1978). Further, the only protection for the program participant in *Miller* was through the workers' compensation insurance carrier for the federal program— there was no statutory language requiring that a compensation system such as the IPP provide the exclusive remedy for program-related injuries.

Unlike the cases referenced by the dissent in which employment may be found where a worker receives room and board or the use of a car in exchange for services provided,[12] or where wages earned were devoted to the reduction of a preexisting obligation,[13] Alcozer was required to report to North Country for 16 hours a week to avoid reduction of his family's welfare grant. Welfare is allocated on the basis of eligibility rather than the labor contributed in work skills programs. It would be impossible to attribute a monetary value to Alcozer's efforts at North Country, as the entire sanction for noncompliance would be imposed if Alcozer failed to fulfill any of the requirements. *See* Minn.Stat. § 256.736, subd. 4(6) (1996). The use of sanctions to motivate recipients to engage in activities that will increase their employability in today's welfare system should not be confused with paid employment. Alcozer was not earning the cash portion of his family's welfare benefits through an employment relationship—he was responding to incentives built into the current welfare rules and taking advantage of a program designed to assist him in moving his family out of public assistance.

The 1995 federal legislation authorizing CWEP provided:

> Nothing contained in this subsection shall be construed as authorizing the payment of aid to families with dependent children as compensation for work performed, nor shall a participant be entitled to a salary or to any other work or training expense provided under any other provision of law by reason of his participation in a program under this subsection.

42 U.S.C. § 682(f)(1)(C) (1995). This language leaves no doubt about congressional intent that welfare benefits are not to be construed as wages[14] and that participation in CWEP programs does not constitute employment. The AFDC and CWEP programs were repealed at the federal level in August of 1996, before Alcozer's injury, in favor of more latitude for states to design their own programs for the support of families with children; the Minnesota legislature created the IPP in the context of that federal language. The legislature clearly did not intend that the exclusive remedy clause of the IPP except CWEP participants like Alcozer or that an employment relationship be created between Alcozer and North Country simply

should be read in conjunction with legislative concerns for the protection of persons who operate vehicles insured by others. 264 N.W.2d at 636–37.

**12.** *See Aleckson v. Kennedy Motor Sales Co.,* 238 Minn. 110, 116, 55 N.W.2d 696 (1952); *Judd v. Sanatorium Comm'n of Hennepin County,* 227 Minn. 303, 307–08, 35 N.W.2d 430, 433–34 (1948).

**13.** *See Cristello v. Township of Irondale,* 195 Minn. 264, 262 N.W. 632 (1935).

**14.** The dissent's concern that IPP benefits are not comparable to workers' compensation benefits because wage loss benefits are not included misses the point. IPP benefits do not include wage loss benefits for the obvious reason that recipients of IPP benefits are paid no wages. It is true, as the dissent notes, that federal regulations at that time required that CWEP participants not covered by workers' compensation be covered by comparable medical and accident protection for on-site injuries. Income maintenance, however, was not required. 45 C.F.R. § 251.2(b) (1995).

because North Country is a non-governmental site. We affirm the determination of the WCCA that Alcozer was not an employee of Polk County or North Country, or a voluntary uncompensated worker.

### III.

Alcozer also presents arguments that Minn.Stat. § 256.737 is unconstitutional. Specifically, he maintains that the exclusive remedy provision of the IPP deprives him of his right to seek a remedy for his injury in violation of Minn. Const. art. 1, § 8, that the IPP provides insufficient procedural due process, and that denial of the benefits available under the Workers' Compensation Act or common law actions is a denial of equal protection in violation of U.S. Const. amend. XIV, § 1 and Minn. Const. art. 1, § 2.

■ As to his assertion that because the IPP does not provide the same benefits available to workers covered by workers' compensation, the IPP fails to provide a constitutionally sufficient remedy for Alcozer's injury, in *Hickman v. Group Health Plan, Inc.* we held that: "The purpose of [Minn. Const. art. 1, § 8] is to protect common law rights and remedies for which the legislature has not provided a reasonable substitute." 396 N.W.2d 10, 14 (Minn.1986).[15] In *Breimhorst v. Beckman,* we recognized that the guaranty of a certain remedy in the law refers to general fundamental principles of justice and that the court must grant the legislature "wide latitude" to address public needs through legislation and determine "both the form and the measure of the remedy for a wrong." 227 Minn. 409, 435, 35 N.W.2d 719, 735 (1949) (citation omitted). We weighed the disadvantages of the Workers'

Compensation Act against its advantages, noting that in exchange for the surrender of the right to damages for injuries that do not affect employability in certain instances, the legislature imposed strict liability upon employers which provide "a certainty of compensatory relief, without the delay of litigation and without regard to any negligence or assumption of risk" on the part of the employee. 227 Minn. at 436, 35 N.W.2d at 735.

The IPP need not provide a legislative substitution for each potential common law action or defense to be constitutional. *See Parson v. Holman Erection Co., Inc.,* 428 N.W.2d 72, 77 (Minn.1988) (upholding a challenged provision of the Workers' Compensation Act noting that a "one-to-one balance" for abrogated common law rights is not necessary to avoid a violation of Article 1, Section 8 of the Minnesota Constitution). Like the Workers' Compensation Act, the IPP replaces common law actions for tort with statutorily mandated recovery of the participant's medical bills and readily ascertainable permanent partial disability benefits and death benefits that are obtainable without the risks inherent in litigation. Minn.Stat. § 256.737, subd. 7(e) (1996). It was not enacted for the same purpose as workers' compensation however, and need not be identical. CWEP participants receive financial support through public assistance, their medical care is reimbursed through public assistance programs, and a number of statutory programs for the support of the disabled are available if they are to become totally disabled. The IPP program complies with regulations requiring coverage for CWEP participants, ensures that medical costs are not incorrectly

---

15. Article 1, Section 8 of the Minnesota Constitution provides: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws."

billed to other publicly funded health care programs, and obviates the need for participants to hire counsel, investigate and litigate their claims. Minn.Stat. § 256.737, subd. 7(b)-(d) (1996) (placing the burden on the county and state to investigate the injury and submit the claim to the legislative subcommittee on claims).

■ Regarding Alcozer's equal protection claim, the classification here providing the exclusive remedy for CWEP participants seeking damages for program-related injuries through the IPP and the exclusive remedy for employees through workers' compensation is constitutional as long as the classification applies uniformly to all those similarly situated, is necessitated by genuine and substantial distinctions between the groups, and effectuates the purpose of the law. *Nelson v. State Dep't of Natural Res.,* 305 N.W.2d 317, 319 (Minn.1981). The Workers' Compensation Act applies to "any person who performs services for hire." Minn.Stat. § 176.011, subd. 9. The IPP similarly applies to all participants in the CWEP programs identified as "nonexempt caretakers in AFDC UP households" who are "participat[ing] in meaningful work experience and training" to develop marketable job skills and comply with work activity requirements and thereby avoid sanctions. Minn.Stat. § 256.737, subd. 1. Thus, the IPP applies uniformly to a specific group of individuals who are similarly situated by reason of their participation in CWEP.

The legislative classification is necessitated by the unique needs of CWEP participants to gain access to work opportunities that will assist them in entering the work force to earn wages and become self-sufficient, as distinguished from the needs of employees already in the work force for protection from wage loss due to injury on the job. The genuine and substantial distinction between the two groups justifies the application of different rules for the remedy of injuries, and the legislative distinction made between employees and CWEP participants is not arbitrary.

We have held it is proper to defer to the legislature in matters "concerning the desirability of statutory classifications affecting the regulation of economic activity and the distribution of economic benefits." *Tibbetts v. Leech Lake Reservation Bus. Comm.,* 397 N.W.2d 883, 890 (Minn.1986) (quoting *Idaho Dep't of Employ. v. Smith,* 434 U.S. 100, 101, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977) (internal citations omitted)). The purpose of the IPP is to provide an adequate remedy for injured CWEP participants who by definition are low-income persons participating in work requirements to avoid welfare sanction and are not earning wages. To that end the IPP provides payment for medical expenses associated with injury, permanent partial disability benefits, and death benefits in a simple and straightforward manner, with a minimum of bureaucratic hassle or need for the participant to seek legal representation or engage in an investigation of the claim. Alcozer's request for compensation of hypothetical future wage loss is more appropriately addressed to the legislature, as it has no bearing on the question of whether a program designed to compensate non-wage-earners for injury is meeting those needs.

■ Turning last to Alcozer's due process claim,[16] deprivation of a protected property interest must be demonstrated. *See American. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 59, 119 S.Ct. 977, 143

---

16. Alcozer argues that the IPP fails to provide procedural due process because Minn.Stat. § 256.737, subd. 7(d) requires claims to be presented to the legislative subcommittee on claims rather than a court and Alcozer did not receive formal notice of the hearing.

L.Ed.2d 130 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"). Alcozer has received medical care for his injury, his medical bills of approximately $3,000 have been fully reimbursed by the program, and Alcozer is not prevented from pursuing a claim for permanent partial disability benefits if he so chooses. As we have previously recognized, "the expectation of workers' compensation benefits is not equivalent to a vested property right * * *." *Lindell v. Oak Park Coop. Creamery*, 369 N.W.2d 505, 507 (Minn.1985) (citation omitted). Alcozer did not have a reasonable expectation of the benefits provided by the Workers' Compensation Act because he was not an employee, and he has thus far received benefits for the care of his injuries under the IPP. Because he has failed to demonstrate deprivation of a protected property interest, his due process claim fails.

We affirm the WCCA and hold that Alcozer was not an employee nor a voluntary uncompensated worker of North Country on the date of his injury for purposes of the Workers' Compensation Act. We also hold that Minn.Stat. § 256.737 is constitutional and that it provides Alcozer's exclusive remedy for the injury allegedly received in conjunction with work activity through the CWEP program.

Affirmed.

PAUL H. ANDERSON, Justice (dissenting).

I respectfully dissent. The narrow issue before the court is whether relator, Arturo Alcozer, an injured workfare worker, is an employee under the Workers' Compensation Act. I conclude that he is. The facts of this case, the plain language of the statute, and our case law all dictate a holding that Alcozer is an employee who should not be excluded from the fundamental protection of our workers' compensation law. Such a holding is consistent with the purpose of the Act and related statutory schemes and it avoids offending well-established public policy principles. Further, unlike the majority's result, it avoids constitutional issues raised by the inadequate benefits available under the Injury Protection Program.

## I. Factual supplement

For a complete understanding of the basis for this dissent, it is useful to supplement the facts set forth in the majority opinion. In 1985, Alcozer and his family moved from Texas to Northern Minnesota where he worked as a farm laborer in the Red River Valley. In December 1996, Alcozer and his family, which included his wife and eight children (ranging in ages from 2 years to 15 years), were living in Crookston and receiving Aid to Families with Dependent Children (AFDC) payments of $1,000 per month. Beginning on December 11, 1996, Alcozer began working 16 hours per week as a warehouse worker in a Community Work Experience Program (CWEP) assignment at the North Country Food Bank.[1] The Food Bank is a nonprofit community service organization. A CWEP assignment is a "workfare" as-

---

1. Under the Family Support Act of 1988(FSA), AFDC recipients were required to participate in job opportunities and work skills training programs. 42 U.S.C. § 603(*l*)(4)(A)(i) (repealed 1996). The FSA was replaced in 1996 by the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA). Pub.L. No. 104–193, 110 Stat. 2105 (codified at 42 U.S.C. §§ 601–18 (Supp. V 1999)). The PRWORA replaced the AFDC program with the Temporary Assistance to Needy Families (TANF) block grant welfare program which gives states a great

signment in which public assistance recipients are required to work for public agencies in return for their public assistance payments. *See* 42 U.S.C. § 682(f) (repealed 1996),[2] Minn.Stat. § 256J.67 (2000).[3]

In his workfare assignment, the Food Bank controlled Alcozer's work environment, including all safety aspects. More specifically, on Alcozer's arrival at the work site, a Food Bank foreman would sign him in and tell him what to do. Alcozer then worked alongside other Food Bank employees, unloading trucks, operating a forklift, sweeping the floor, and boxing packages of food for distribution. On February 10, 1997, while lifting a pallet, Alcozer sustained a work-related left arm injury. Although initially diagnosed as a contusion, the injury led to ulnar nerve transposition surgery in December 1997, and Alcozer still has numbness in his fingers. His medical bills were paid through the state's medical assistance program.

Alcozer sought workers' compensation benefits for his injury, including temporary total disability benefits and rehabilitation services. He named the Food Bank and Polk County as his employers. Polk County and the Food Bank denied liability, asserting among other things that workfare workers like Alcozer were not employees within the meaning of the workers' compensation law. The Department of Human Services intervened, seeking reimbursement for medical and subsistence payments made on behalf of and to Alcozer. Following an evidentiary hearing, a compensation judge denied Alcozer's claim, concluding that Alcozer was not an employee because he was not a voluntary uncompensated worker and because there was no contract for hire. The Workers' Compensation Court of Appeals affirmed.

## II. Alcozer is an "employee" under the Workers' Compensation Act

### A. *Plain language of statutes and case law*

When we review factual findings of a compensation judge, we will not disturb the findings unless they are manifestly contrary to the evidence presented. *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 60 (Minn.1984). However, if the controlling facts are not in dispute, the determination of whether a person is an employee is a question of law. *Oelrich v. Schlagels, Inc.*, 426 N.W.2d 430, 433 (Minn. 1988). Questions of law are reviewed de novo. *Kliniski v. Southdale Manor, Inc.*, 518 N.W.2d 7, 9 (Minn.1994). Here, the controlling facts are not in dispute.

The Workers' Compensation Act defines an employee as "any person who performs services for another for hire * * *." Minn.Stat. § 176.011, subd. 9 (2000).[4] The definition includes a list of persons who are included as employees under the Act.

---

deal of discretion in developing their own assistance programs. *Id.*

**2.** Under the FSA, a CWEP program was to be directed at improving employability through work experience and was limited to useful public projects. 42 U.S.C. § 682(f)(1)(A) (repealed 1996). The PRWORA essentially removes all restrictions on the permissible use of a work experience program, with the exception that sufficient public sector employment must be unavailable. 42 U.S.C. § 607(d)(4) (Supp. V 1999).

**3.** CWEP has been retained in Minnesota. *See supra* majority opinion note 4.

**4.** As a preliminary matter, it is important to note that the respondents did not assert that Alcozer was not an employee in their initial appearances in this matter, but instead asserted that he was someone else's employee. It was only upon the state's involvement in the summary decision conference that the respondents began asserting that Alcozer was not an employee at all.

*Id.* A voluntary uncompensated worker participating in a program established by a local social services agency is one such person. *Id.*, subd. 9(10). Alcozer asserts that at the time of his injury, he was either an employee—performing a service for hire—or he was a voluntary uncompensated worker.

The plain language of the Act and relevant case law support the conclusion that Alcozer is an employee under the Act. More specifically, the Act defines an employee as one who performs services for hire and Alcozer meets the three indicia of a contract for hire. First, Alcozer performed his labor in exchange for something because his receipt of public assistance is a function of his labor and Alcozer's labor is mandatory under the statute. Second, Alcozer was paid for his work within the meaning of the Act because he received public assistance, indicating that his work was not gratuitous. A person need not receive wages as compensation for labor to be an employee. Third, Alcozer voluntarily chose to work within the meaning of the Act. The fact that he would forego public assistance if he discontinued working does not make his labor compulsory because in all fields, one must work to receive compensation.

Under the law of workers' compensation, a "contract of hire" is a requisite element of an employment relationship, indicating that labor is being performed in exchange for something of value and not gratuitously. *Miller v. Federated Mut. Ins. Co.*, 264 N.W.2d 631, 635 (Minn.1978). A "laborer whose receipt of payment is dependent on and in proportion to his or her labor" should be considered an employee. 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 64.04 (2000). Compensation is often denied to a worker receiving public assistance on the theory that such a person would continue to receive "the same assistance whether working or not" and is therefore not an employee. *Id.* Nevertheless, a CWEP worker's receipt of public assistance is dependent on and in proportion to his labor.

Work requirements under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and the Minnesota Family Investment Program of 1997 (MFIP) are mandatory, and failure to comply with work participation requirements results in either a pro rata reduction in the amount of assistance or termination of benefits. 42 U.S.C. § 607(e)(1) (Supp. V 1999); Minn.Stat. § 256J.55, subd. 1(c) (2000). Further, there is a 5–year lifetime limit on the receipt of assistance. 42 U.S.C. § 608(a)(7) (Supp. V 1999); Minn.Stat. § 256J.42 (2000).[5]

The federal legislation authorizing the CWEP program put in place in Minnesota, as well as the state legislation continuing the program, are related to compensation at an hourly wage rate. The law limits the number of hours that a CWEP worker may work to the quotient of the applicable benefit rate divided by the federal or applicable state minimum wage rate. 42 U.S.C. § 682(f)(1)(B)(i) (repealed 1996); Minn. Stat. § 256J.67, subd. 4(d). After a CWEP worker has been assigned to a position for 9 months, the maximum number of hours are limited to the "MFIP standard of need divided by the rate of pay for individuals employed in the same or similar occupations by the same employer at the same site." Minn.Stat. § 256J.67,

---

**5.** The 5–year lifetime limit is a present reality. It has been reported that Minnesota recently had its first public assistance recipients reach this limit. Debra O'Connor, *Time's up for one Minnesota family*, St. Paul Pioneer Press, Aug. 31, 2001, at 1B. *New legal limit on welfare will hit home for first time*, Star Tribune (Minneapolis), Sept. 1, 2001, at B3.

subd. 4(d); *accord* 42 U.S.C. § 682(f)(1)(B)(ii) (repealed 1996) (using a similar calculation). While these provisions help to avoid displacement of regular public workers, "[t]hese provisions, in effect, recognize[ ] that if the provision of public assistance justifie[s] the imposition of a work requirement, the extent of that requirement should be premised on the amount of assistance provided." Matthew Diller, *Working Without a Job: The Social Messages of the New Workfare*, 9 Stan. L. & Pol'y Rev. 19, 22 (1998).

To satisfy the workers' compensation "employee" requirement that there is a contract of hire, there must be an element of payment. Under our previous case law, we have concluded that payment need not be "pecuniary compensation if, in consideration of services, the employe [sic] receives from the employer any services, goods, or accommodations of substantial financial value such as farm work, fuel, heat, light, clothing, board, lodging, laundry, or tuition." *Aleckson v. Kennedy Motor Sales Co.*, 238 Minn. 110, 116, 55 N.W.2d 696, 700 (1952) (involving the use of a car as compensation for services); *accord Oelrich*, 426 N.W.2d at 433 (involving on-the-job training as compensation); *Krause v. Trustees of Hamline Univ.*, 243 Minn. 416, 419, 68 N.W.2d 124, 126 (1955) (involving room and board as compensation); *Judd v. Sanatorium Comm'n*, 227 Minn. 303, 307–08, 35 N.W.2d 430, 433–34 (1948) (involving

room and board as compensation). Further, the fact that a workfare worker receives public assistance instead of wages does not mean that his or her labor is gratuitous. *Cristello v. Township of Irondale*, 195 Minn. 264, 265, 262 N.W. 632, 633 (1935) (stating that right to compensation not lost because worker was, at the time of injury, working out poor relief). Simply put, a workfare worker performs services in order to receive public assistance.

A contract of hire also involves a voluntary choice of working. *See* 3 Larson & Larson, *supra* § 64.03. The fact that a workfare worker "will forego relief if he discontinues working does not make his employment compulsory. In all fields of endeavor[,] work is a condition precedent to remuneration." *County of Los Angeles v. Workers' Comp. Appeals Bd.*, 30 Cal.3d 391, 179 Cal.Rptr. 214, 637 P.2d 681, 685 n. 4 (1981) (quoting Thelma Brook & Harold M. Simon, Comment, *Relief Workers and Workmen's Compensation*, 36 Ill. L.Rev. of Nw. U. 773, 776 (1942)).[6]

Moreover, federal employment statutes treat Alcozer as an employee. It is undisputed that federal legislation and corresponding regulations implementing CWEP attempt to make it clear that workfare placements are not jobs. *See, e.g.*, 42 U.S.C. § 682(f)(1)(C) (repealed 1996). But federal regulations in place at the time

**6.** A contract for hire is equally important in the context of lent employment. *Miller*, 264 N.W.2d at 635. When a general employer "lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if: (a) the employee has made a contract of hire, express or implied, with the special employer; (b) the work being done is essentially that of the special employer; and (c) the special employer has the right to control the details of the work." 3 Larson & Larson, *supra* § 67.00 (2000). Both employers are liable when all three conditions are satisfied in relation to both em-

ployers. *Id.* When the general employer is in the business of furnishing employees, where consent to a special employment relationship may be inferred and conditions (b) and (c) are satisfied, the special employer is liable for benefits unless the parties have arranged for a different distribution for payment of benefits. *See Bilotta v. Labor Pool, Inc.*, 321 N.W.2d 888, 890 (Minn.1982); Minn.Stat. § 176.071; 3 Larson & Larson, *supra* § 67.04(3). Here, there was some indication of an agreement that the general employer, Polk County, would be responsible for workers' compensation insurance and benefits.

CWEP was implemented in Minnesota required workers' compensation coverage or comparable protection. 45 C.F.R. § 251.2(b) (1995). The PRWORA of 1996 is silent on the issue, although the Department of Labor's position is that workfare workers are still considered employees for purposes of federal employment laws. U.S. Department of Labor, *Department of Labor Guidance: How Workplace Laws Apply to Welfare Recipients*, Daily Lab. Rep. (BNA) No. 103, at E 3 (May 29, 1997). Thus, even though the CWEP legislation and regulations attempt to classify workfare placements as something other than a job, workfare workers are considered employees for purposes of federal employment statutes. They should, therefore, be considered employees for purposes of state employment laws.

Given that PRWORA and MFIP require public assistance recipients to work in exchange for their public assistance payments and place a 5-year lifetime limit on such assistance, workfare participants are essentially in the same position as other workers doing similar work for purposes of receiving workers' compensation. Therefore, I conclude that workfare participants are employees under the Workers' Compensation Act and are entitled to protection under the Act.

### B. *Alcozer's employee status is consistent with purpose of the Act*

Because workfare workers are similarly situated to regular workers, it is both logical and consistent with the purposes of the Act to include these workers under the Act's protective umbrella. Workers' compensation is social legislation, providing a measure of security to workers injured on the job, with the burden of that expense considered a proportionate part of the cost of production. *Franke v. Fabcon, Inc.*, 509 N.W.2d 373, 376 (Minn.1993). The whole scheme is one of reciprocal concessions by the employer and employee. *Lambertson v. Cincinnati Corp.*, 312 Minn. 114, 120–21, 257 N.W.2d 679, 684 (1977). An injured employee is guaranteed compensation from his or her employer for work-related injuries regardless of the employee's fault or the employer's lack of fault, in exchange for forfeiting the right to sue the employer in tort. *Minn. Brewing Co. v. Egan & Sons Co.*, 574 N.W.2d 54, 58 (1998) (citing *Lambertson*, 312 Minn. at 120–21, 257 N.W.2d at 684). In most other circumstances, the employee retains his or her common law right to recover in tort from a negligent third party. *Minn. Brewing*, 574 N.W.2d at 58.

Workers' compensation provides support for workers disabled by compensable injuries during periods of actual disability and for their dependents in the event of a work-related death, together with hospital, medical, and funeral expenses. "If the injury left the worker with some permanent bodily impairment, compensation for that impairment has been allowed regardless whether the worker sustained a reduction in wages." *O'Mara v. State, Univ. of Minn.*, 501 N.W.2d 603, 606 (Minn.1993) (citations omitted). "Liability on the part of an employer or the insurer for disability of a temporary total, temporary partial, and permanent total nature shall be considered as a continuing product and part of the employee's inability to earn or reduction in earning capacity due to injury or occupational disease and compensation is payable accordingly, subject to section 176.101." Minn.Stat. § 176.021, subd. 3 (2000).

With the exception of bodily impairment and medical payments, practically all benefits under workers' compensation are calculated as a percentage of the employee's average weekly wage. The object of this wage determination is to "arrive at a fair

approximation of [the employee's] probable future earning power which has been impaired or destroyed because of the injury." *Knotz v. Viking Carpet,* 361 N.W.2d 872, 874 (1985) (quoting *Sawczuk v. Special Sch. Dist. No. 1,* 312 N.W.2d 435, 437–38 (Minn.1981) (alteration in original) (citations omitted)). When evidence of an employee's past performance does not exist, an employee's "probable productive capacity" may be "gauged by the wages paid to one doing similar work." *Berry v. Walker Roofing Co.,* 473 N.W.2d 312, 315 (Minn. 1991) (citing *Johnson v. D.B. Rosenblatt, Inc.,* 265 Minn. 427, 429, 122 N.W.2d 31, 33 (1963)).

The PRWORA and MFIP are predicated on the assumption that workfare workers "can and should be required to work in exchange for their benefits." Diller, *supra* at 19. Given this presumption of a "probable productive capacity," there is absolutely no justification for denying workfare workers compensation for any "future earning power" that is impaired or destroyed because of an injury that is causally related to the workfare work. Indeed, it is inconsistent with the purpose of the Act to treat workfare workers differently when they are required to work in exchange for their benefits and their future earning power can be impaired or destroyed due to a workplace injury. This is especially troublesome in light of the fact that workfare workers are in more need of protection than regular workers due to

their lack of mobility and low bargaining power. *See* Vadim Mahmoudov, *Are Workfare Participants "Employees"?: Legal Issues Presented by a Two–Tiered Labor Force,* 1998 Ann. Surv. Am. L. 349, 385 (1998).

### C. *The IPP does not provide protection at the same level and to the same extent as required by the Workers' Compensation Act*

To support their position that Alcozer is not an employee under the Act, respondents assert that workfare workers in Minnesota have comparable protection for workplace injuries under the Injury Protection Program (IPP). In reaching its holding, the majority apparently has agreed with respondents' position.[7] When Minnesota put its CWEP program in place, federal regulations required that CWEP workers not covered by workers' compensation "be provided with medical and accident protection for on-site injury at the same level and to the same extent as that required under the applicable State's workers' compensation statute for covered employment." 45 C.F.R. § 251.2(b) (1995). In response, the Minnesota legislature enacted the IPP. Act of May 18, 1995, ch. 178, art. 2, § 18, 1995 Minn. Laws 630–32 (now codified at Minn.Stat. § 256J.68 (2000)).[8]

Benefits provided under the IPP are "limited to reimbursement for reasonable

---

**7.** The WCCA, noting that its jurisdiction does not extend to matters outside the workers' compensation system, Minn.Stat. § 175A .01, subd. 5 (2000), did not address IPP issues in light of its determination that workfare workers do not come within the coverage of the workers' compensation laws. Ordinarily, when the WCCA does not have jurisdiction, the parties go to the courts for relief, *see Maxwell Communications v. Webb Publ'g Co.,* 518 N.W.2d 830, 831 (Minn.1994), but this legal recourse is often onerous for workfare workers who, more than any other class of

workers, cannot afford the expense and time of litigation.

**8.** At the time of Alcozer's injury, the IPP was codified at Minn.Stat. § 256.737, subd. 7 (1996). Following the replacement of AFDC with TANF, the IPP was included in the MFIP program and is now codified at Minn.Stat. § 256J.68 (2000). The provisions relevant to this appeal are essentially unchanged by the recodification.

medical expenses and permanent partial disability * * * in like amounts as allowed in section 176.101, subdivision 2a." Minn. Stat. § 256J.68, subd. 6. Compensation for injuries resulting in death are payable to a CWEP worker's estate up to $200,000. *Id* . No compensation is allowed for pain and suffering, wage loss, or any other benefits allowed under the workers' compensation law. *Id.* All payments made under the IPP are to be reduced by any proceeds "received by the claimant from any insurance policy covering the loss," with the exception of payments made under the state's medical assistance or general assistance programs. *Id.*

To conclude, as the majority apparently has done, that the IPP provides benefits comparable to workers' compensation is disingenuous at best. The fundamental component of workers' compensation coverage is the wage loss benefit, a benefit expressly excluded by the IPP. Workers' compensation wage loss benefits are calculated on a wage basis that approximates impaired earning power. Minn.Stat. § 176.101, subds. 1, 2, 4 (2000). For workers without a sufficient wage history, wages from those similarly employed may be used. *See Berry*, 473 N.W.2d at 315. Now, in light of the 5 year lifetime limit on MFIP, an injured workfare worker is in need of the same income maintenance protection as a regular employee covered by workers' compensation. Further, even though the IPP provides compensation for permanent partial disability, permanent

partial disability is compensation for functional loss and not compensation for loss of earning capacity. *See O'Mara*, 501 N.W.2d at 606; *Gasper v. Northern Star Co.*, 422 N.W.2d 727, 731 (Minn.1988).[9]

D. *IPP exclusive remedy provision does not bar Workers' Compensation benefits*

The majority's conclusion that workfare workers must rely exclusively on IPP's significantly inferior coverage is not only inconsistent with federal law, it is also a conclusion that is directly at odds with the plain meaning of IPP's exclusive remedy provision. It is undisputed that under the exclusive remedy provision of the IPP, the state and its political subdivisions are not subject to suit by a CWEP participant. Minn.Stat. § 256J.68, subd. 7. However, the question in this case is whether, under the CWEP contract, the Food Bank is a political subdivision for purposes of the exclusive remedy provision. Chapter 256J does not define the term "political subdivision." Elsewhere in the Minnesota Statutes, a "political subdivision" is defined as a "county, a statutory or home rule charter city, a town, a school district, or other political subdivision of the state." *E.g.*, Minn.Stat. § 465.719, subd. 1(a) (2000).[10] In a few sections, the definition also includes agencies of the political subdivision, but in those sections the applicability of the definition is limited to the specific function of the particular chapter. *E.g.*, Minn.Stat. § 162.02, subd. 3a ("an agency

---

**9.** Other workers' compensation benefits excluded by the IPP include rehabilitation and retraining (including the costs of tuition, books, travel, custodial day care, board and lodging and relocation expenses), Minn.Stat. § 176.102, subds. 9, 11 (2000); rehabilitation services for a surviving spouse, Minn.Stat. § 176.102, subd. 1a (2000); allowances for dependents, Minn.Stat. § 176.111 (2000); interest and penalties, Minn.Stat. § 176.221, .225 (2000); cost of living adjustments, Minn.

Stat. § 176.645 (2000); and civil damages for the obstruction of benefits, Minn.Stat. § 176 .82 (2000).

**10.** Similar definitions may be found in Minn. Stat. §§ 3.986, subd. 4; 6.56, subd. 1; 12.03, subd. 9; 103G.005, subd. 14b; 115A.03, subd. 24; 169A.48, subd. 1; 221.81, subd. 1(b); 469.1812, subd. 4; 609.415, subd. 1(5) (2000).

of a political subdivision which has jurisdiction over parks"); Minn.Stat. § 471.49, subd. 3 ("any agency or unit * * * authorized to levy taxes or empowered to cause taxes to be levied"). Thus, both the plain language of Minn.Stat. § 256J.68, subd. 7, and other statutes indicate that the IPP exclusive remedy clause does not bar a suit against a subcontractor of a political subdivision. When the language of a statute is not ambiguous, we will give effect to the plain meaning of the words. *See Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980).[11]

Despite the plain language of the statute, the majority concludes that the legislature intended that the IPP be the exclusive remedy for CWEP participants and that allowing a CWEP participant to assert a workers' compensation or common law claim against a nonprofit organization would undermine this intent. Respondents asserted the same argument, but this argument is not persuasive. Had the legislature intended the result respondents seek and the majority reaches, it could have written the IPP exclusive remedy provision such that it would apply to any employer under the Act as it did in the workers' compensation statute. *See* Minn. Stat. § 176.031 (2000). The legislature also could have included subcontractors of the state in the IPP exclusive remedy clause.

Respondents also assert that there is a strong public policy reason for concluding that the Food Bank is a political subdivision, because nonprofit organizations like the Food Bank will not participate in the CWEP program if they are liable for workers' compensation for the participants. It is important to note, though, that the Food Bank has asserted that its contract with the CWEP program provides that CWEP will be responsible for "Workers' Compensation." The impact of the contract is not before the court, but if the Food Bank is required to provide workers' compensation benefits to Alcozer, it could possibly assert a claim against the CWEP program for those costs, thereby negating any disincentive to participate in the CWEP program. I cannot ignore the plain language of the statute in order to satisfy a competing policy objective. *See Frank's Nursery Sales,* 295 N.W.2d at 608–09.

Given that IPP's remedy provision does not bar workers' compensation coverage for workfare workers, the majority's conclusion that IPP is the workfare worker's exclusive remedy conflicts with the plain meaning of the IPP statute and, in doing so, unnecessarily creates a conflict with the federal mandate that workfare workers receive the same coverage as regular workers. Therefore, I conclude that the plain language of Minn.Stat. § 256J .68, subd. 7, provides that the Food Bank is not immune from suit for injuries to CWEP participants while working at the Food Bank as part of CWEP. I would conclude that Alcozer as a workfare worker at the Food Bank was in the same position as other employees. Accordingly, I would hold that Alcozer is an employee under the Workers' Compensation Act and is entitled to the protection guaranteed to employees covered by the Act.

---

**11.** Alcozer also asserts that the legislature intended that the IPP would provide only secondary coverage. He cites another provision of the IPP that directs that any payments made under the IPP "shall be reduced by any proceeds received by the claimant from any insurance policy covering the loss. * * * ['I]nsurance policy['] does not include the medical assistance program * * *." Minn. Stat. § 256J.68, subd. 6. Alcozer argues that this provision illustrates that the legislature intended that the CWEP participants might recover from another source—workers' compensation.

### III. Constitutional issues

#### A. *Abrogation of Common Law Rights*

The majority's conclusion that Alcozer is not an employee under the Act creates constitutional issues—namely, the abrogation of common law rights and equal protection problems. Given that we ought to favor an interpretation of a statute that does not conflict with constitutional mandates over one that does, the majority's interpretation of the statute is disfavored. *State ex rel. Forslund v. Bronson*, 305 N.W.2d 748, 751 (Minn.1981) (stating that construction that avoids constitutional conflict is preferred). Having concluded that Alcozer is an employee under the Act, it would not be necessary to reach the constitutional issues relating to the IPP. However, in view of the majority's disposition, these issues cannot be avoided.

Traditionally we have approached with caution legislation abrogating a cause of action for which there was at common law a remedy involving the right to a trial by jury.[12] When we have addressed such legislation, we have focused on the adequacy of the substituted remedy. In *Breimhorst v. Beckman*, 227 Minn. 409, 35 N.W.2d 719 (1949), an employee sought common law damages for serious disfigurement, a disability not covered by the Workers' Compensation Act, that did not affect her employability. The employee in *Breimhorst* challenged the constitutionality of the Act on the grounds that its exclusiveness of remedy deprived her of both the right to a trial by jury and an adequate remedy for her injuries. *Id.* at 429–30, 35 N.W.2d at 732. In *Breimhorst*, we said that so long as the substituted remedy is adequate, the

legislature may withhold the right of a jury when substituting a new and fundamentally different remedy upon a cause of action for which there was a right of trial by jury at common law. *Id.* at 434, 35 N.W.2d at 734. In finding the remedy adequate in *Breimhorst*, we said:

> In return for the fixed liability of her employer, whether he has been negligent or not, it naturally follows that the employe [sic] here has been required to surrender something in return, such as the right to damages for certain disabilities which do not affect her employability where she has otherwise become entitled to compensation for associated injuries.

*Id.* at 436, 35 N.W.2d at 735.[13] As previously noted, the IPP abrogates Alcozer's common law rights; however, unlike the Workers' Compensation Act, it also excludes compensation for disability that does affect employability.

#### B. *IPP benefits not an adequate substitute*

In the context of reviewing the constitutional validity of the Workers' Compensation Act, we have said that "neither a one-for-one balance nor a reasonable substitute for abrogated [common-law] rights is required for validity." *Parson v. Holman Erection Co.*, 428 N.W.2d 72, 77 (Minn. 1988) (quoting *Tracy v. Streater/Litton Industries*, 283 N.W.2d 909, 914 (Minn. 1979)). In *Parson*, we were asked to pass on the constitutionality of limitations on wage loss benefits occasioned by legislative revisions in 1983. *Id.* For more than 10 years before the 1983 amendments, severe criticism had been directed at Minnesota's

---

12. The right to trial by jury is expressly preserved by the Bill of Rights of both the United States Constitution and the Minnesota Constitution. U.S. Const. amend. VII; Minn. Const. art. I, § 4.

13. The Act currently includes compensation for serious disfigurement of the face due to burns. Minn.Stat. § 176.105 (2000); Minn. R. 5223.0240.

system for compensating employees whose work-related permanent impairment prevented their return to a pre-injury line of work, even though they were able to do other work. Several detailed studies identifying major problems with the system preceded the amendments. Altman, Benanav, Keefe & Volz, *Minnesota's Workers' Compensation Scheme: The Effects and Effectiveness of the 1983 Amendments*, 13 Wm. Mitchell L.Rev., 843, 846–60 (1987). It was in this setting that the legislature revised the Act, eliminating the open-ended nature of temporary total benefits, the subject of litigation in *Parson*. Act of June 7, 1983, ch. 290, § 43, 1983 Minn. Laws 1339.

By contrast, the IPP was simply "modeled deliberately" after the provision for claims for injury or death of conditionally released prison inmates who are ordered to work outside the prison. *See* Minn.Stat. § 3.739 (2000). Aside from the fact that the denial of compensation for prison injuries has come under criticism when "all the risks of ordinary employment are present," 3 Larson & Larson, *supra* § 64.03(5), workfare workers are not prisoners and should not be treated the same or worse. Nevertheless, even conditionally released inmates are treated better than the majority treats workfare workers because inmates are allowed compensation for permanent total disability whereas workfare workers are not. *See* Minn.Stat. § 3.739, subd. 2a.

## C. *Equal Protection issue*

Unless public assistance legislation infringes on a fundamental right, the "rational basis" test applies when measuring classifications created by a public welfare benefits scheme against the equal protection clause. *See Blue Earth County Welfare Dep't v. Cabellero*, 302 Minn. 329, 342, 225 N.W.2d 373, 381 (1974). Legislation that unfairly and arbitrarily targets a politically unpopular group, however, will not withstand equal protection scrutiny. *See, e.g., Romer v. Evans*, 517 U.S. 620, 635–36, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating state constitutional amendment prohibiting antidiscrimination ordinances from protecting gays and lesbians); *Plyler v. Doe*, 457 U.S. 202, 230, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (invalidating a state law denying public education to children of illegal immigrants; concern for preservation of limited state resources insufficient justification). Respondents assert that the fact workfare workers are not earning wages at the time of injury justifies the exclusion of wage loss benefits from the IPP program. The absence of a wage does not exclude other workers, including voluntary uncompensated workers, from the receipt of workers' compensation wage loss benefits. The law requires that workfare workers perform work to earn a living and puts them into situations where they encounter the same workplace risks as do covered employees. The majority provides no rational basis for distinguishing between workfare participants and other workers performing similar work for the purpose of receiving workers' compensation. Noelle M. Reese, *Workfare Participants Deserve Employment Protections Under the Fair Labor Standards Act and Workers' Compensation Laws*, 31 Rutgers L.J. 873, 907–08 (2000).

## IV. Procedural issues

The IPP raises procedural concerns as well. Under the IPP, the county agency supervising the CWEP work investigates a CWEP work injury and submits "valid claims" to the Department of Human Services. Minn.Stat. § 256J.68, subd. 2. The Commissioner of the Department of Human Services then submits claims for permanent partial disability to the Commissioner of the Department of Labor and

Industry who, in turn, reviews the claims and makes recommendations pertaining to payments on the claims to the Department of Human Services. Minn.Stat. § 256J.68, subd. 3. The Commissioner of the Department of Human Services makes determinations as to the propriety of claims of less than $1,000 and submits a list of claims over $1,000 to appropriate legislative committees in the Senate and House of Representatives, together with recommendations on appropriate compensation. Minn.Stat. § 256J.68, subds. 4, 5. Those claims are then heard and determined by legislative committees. *Id.* This procedure for handling IPP claims implicates serious separation of powers and due process problems. *See Meath v. Harmful Substance Comp. Bd.,* 550 N.W.2d 275, 279 (Minn.1996) (involving separation of powers challenge); *Manderfeld v. J.C. Penney,* 526 N.W.2d 52, 54 (Minn.1995) (stating that parties in workers' compensation proceeding are entitled to due process). When reaching its holding, the majority fails to give due consideration to these important procedural problems with the IPP.

## V. General policy issues

The majority's decision to deny workers' compensation protection to workfare workers has the potential to create a two-tiered labor force or "workfare caste" which undermines the intent of fair labor standards laws by promoting the displacement of regular public workers with workfare workers who are not covered by workers' compensation. *See* Reese, *supra* at 901; Mahmoudov, *supra* at 365. Although the PRWORA and MFIP contain nondisplacement clauses, if workfare workers are denied workers' compensation coverage, public agencies may view this denial of benefits as an incentive to reduce their regular workforce through retirement and/or attrition and then fill their ranks with lower-cost workfare workers. Reese, *supra* at 908–09. There is evidence that regular employees have been displaced by workfare. Mahmoudov, *supra* at 362 n. 67.[14] "Employment protections are necessary not only to prevent the exploitation of workfare participants, but also to thwart the displacement of regular public workers with lower paid workfare workers." Reese, *supra* at 907.

Denying workers' compensation can unfairly burden dependents of deceased workfare workers by treating "those who are less fortunate, simply because they are less fortunate, differently from others similarly situated." *State ex rel. Patterson v. Indus. Comm.,* 77 Ohio St.3d 201, 672 N.E.2d 1008, 1012 (1996); *see* Mahmoudov, *supra* at 383. In *Patterson* the widow of a "work-relief" worker who died from histoplasmosis as a result of workplace exposure to pigeon droppings sued the Industrial Commission of Ohio, challenging the validity of a system that awarded significantly less benefits to dependents of work-relief workers than were awarded to non-work-relief workers. *Id.* at 1009. The Ohio court found no rational basis for "such blatant disparate treatment." *Id.* at 1012.

Denying workers' compensation also may have a disproportionate impact on single mothers. "The vast majority of AFDC [now TANF] recipients are single mothers with the sole responsibility for their children's upbringing." Benjamin L. Weiss, *Single Mothers' Equal Right to*

---

14. Mahmoudov cites several incidents of regular employee displacement by workfare in New York, including Woody Allen's use of workfare workers "presumably assigned to him by a friendly city official, to 'do all the costumes and sets' for one of his movies, since he 'can't afford actual technicians.' " Mahmoudov, *supra* at 362 n. 67 (quoting Jack Kroll, *Knock on Woody, He's Doing Fine,* Newsweek, July 20, 1998, at 67).

*Parent: A Fourteenth Amendment Defense Against Forced Labor Welfare "Reform,"* 15 Law & Ineq. 215, 219 (1997). Because PRWORA's work participation rate requirements do not apply to adults without minor children, it is anticipated that "[o]ver time," mothers "will come to dominate" the workfare program. Diller, *supra* at 30 n. 158. The denial of workers' compensation for workfare-related injuries could therefore disproportionately burden single mothers.[15]

Finally, the denial of workers' compensation to workfare workers perpetuates stigmatization of public assistance recipients as societal failures. Under PRWORA and MFIP, public assistance recipients are required to fulfill the obligations of employees, but under the result reached by the majority, they do so without the same legal protections, rights, and privileges that other employees enjoy. "They continue to be subject to a larger system designed to communicate the message that recipients are social failures rather than productive members of society." Diller, *supra* at 29. Unfortunately, the majority's denial of workers' compensation protection now becomes a part of this stigmatization.

## VI. Conclusion

I would hold that a workfare worker whose public assistance is dependent on and in proportion to his labor is an employee within the plain meaning of our workers' compensation laws. Most workfare workers are doing the same work as covered employees and are encountering the same workplace risks. If the purpose of workfare truly is to give those who are not otherwise able to gain employment a work experience which will, in the end, make them productive workers, then surely they are entitled to at least the same basic rights, privileges, and protections that every other employee has had a right to expect since our workers' compensation laws were implemented in 1913. The result reached by the majority denies these basic rights, privileges, and protections. Therefore, I must dissent.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

GILBERT, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

**15.** The same might be said for nonwhite communities. "While roughly equal numbers of [black and white] households receive public assistance, the 1.54 million black households that receive it are a major percentage of [black] communities." Susan L. Thomas, *"Ending Welfare As We Know It," or Farewell to the Rights of Women on Welfare? A Constitutional And Human Rights Analysis of the Personal Responsibility Act,* 78 U. Det. Mercy L.Rev. 179, 201 (2001).